778 F.2d 112
 Robert MARCELLA, Plaintiff-Appellee-Cross-Appellant,
v.
ARP FILMS, INC., Westchester Films, Inc., Centaur
Distribution Co., and Claude S. Hill, Defendants,
ARP Films, Inc., and Claude S. Hill,
Defendants-Appellants-Cross-Appellees,
Westchester Films, Inc., and Centaur Distribution Co., Inc.,
Defendants-Appellees.
 Nos. 78, 79 and 141, Dockets 85-7255, 85-7261 and 85-7305.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 19, 1985.
Decided Dec. 3, 1985.
 
 Arthur J. Ginsburg, New York City (Howard Gotbetter, Gerald E. Singleton, Frankfurt Garbus Klein & Selz, P.C., New York City, of counsel), for defendants-appellants-cross-appellees and defendants-appellees.
 Arthur Kokot, New York City (Kay Collyer & Boose, New York City), for plaintiff-appellee-cross-appellant.
 Before LUMBARD, OAKES and NEWMAN, Circuit Judges.
 OAKES, Circuit Judge.
 
 
 1
 This case arises out of Robert Marcella's employment as a salesman of exhibition license agreements for distributors of film series (principally children's cartoons such as "Spiderman," "Incredible Hulk," and "Marvelous Super Heroes") to television stations. The appeal and cross-appeal in this diversity contract action involving sales commissions and a stock buy-out agreement presents two principal questions: (1) whether the defendant distributors were deprived of the defense of disloyalty on the part of the plaintiff salesman; and (2) whether some of the commissions found due were premature. The United States District Court for the Southern District of New York, Milton Pollack, Judge, after a jury answered special interrogatories, entered a judgment in favor of plaintiff Marcella in the sum of $176,874 against defendant ARP Films, Inc. ("ARP") for sales commissions, and $221,760 against defendant Claude S. Hill ("Hill") (the sole owner of ARP and the other two corporate defendants) for payments due Marcella under an agreement whereby Hill bought out Marcella's stock interest in defendant Westchester Films, Inc. ("Westchester").[1] Hill does not challenge the judgment against him. ARP claims that it was deprived of a defense of disloyalty and of affirmative relief based on Marcella's allegedly developing and promoting on his own behalf an idea for a televised animated sales promotional program known as "Ready Set Go" ("RSG") while employed by ARP and Westchester. ARP also claims that Marcella has no right to some $59,386 in commissions on the "New Spiderman" series until Marvel Comics first recoups $3,000,000 in royalties per Hill's agreement with it. We also consider other claims, defenses, and the claims on Marcella's cross-appeal.
 
 
 2
 We affirm.
 
 FACTS
 
 3
 In 1977 Marcella began to work as an exclusive salesman for ARP and Centaur Distribution Co., Inc., two of Hill's corporations. His job was to solicit television stations to enter into license agreements for film series. He and Hill had an express oral agreement whereby Marcella would be compensated solely by payment of a commission on the gross license fees payable by the stations to ARP on the orders that Marcella solicited. These commissions were payable in installments as the license fees were collected, generally over a period of twenty-four to thirty-six months. The applicable commission rates, as the jury found, were 15% and 12 1/2 depending upon the program. These rates are reflected in some forty-six checks from ARP to Marcella in payment of commissions over the course of four years and in ARP's corresponding commission reports and ledger cards which are expressly cross-referenced on the face of the checks. These commission rates were conceded by ARP and can be mathematically computed from the commissions paid on the license revenues received by ARP.
 
 
 4
 In a separate transaction, Marcella and Hill entered a buy-out agreement involving two corporations, Westchester Films, Inc., and Westchester Merchandising Corp. (together "the Westchester companies"), which were formed by Marcella and Hill in 1978 to exploit the "Starblazers" cartoon program and related merchandising rights. Marcella and Hill each had a one-half interest in Westchester Films and a one-third interest in Westchester Merchandising. On October 9, 1981, Hill and Marcella executed the one-page agreement ("the buy-out agreement") drafted by Hill pursuant to which Hill agreed to pay Marcella $250,000 for Marcella's interest in the Westchester companies, payable $4,000 a month for the first twelve months, $5,000 a month for the next twelve months and $11,833 a month for the third twelve months. After making the first thirteen monthly installments, i.e., $53,000, Hill paid nothing. Marcella also received under the agreement certain rights in certain films and each party (Marcella and Hill) released the other from all suits or claims relative to the Westchester companies "and regarding each other."
 
 
 5
 "Ready Set Go" is a venture that Marcella created in conjunction with two individuals, Peters and Fujita, and with the formation of three corporations (Ready Set Go Productions, Inc., Modern Programs International S.A. and Instant Miracles, Inc.). RSG was to take the form of five-minute animated televised inserts intended for advertising use by fast food merchandisers. Marcella conceived the idea when he was with ARP but the programs were not produced until after he left.
 
 
 6
 The parties' testimony as to RSG was in direct conflict. Marcella testified that he fully disclosed the RSG concept to ARP at RSG's inception and that he had ARP's blessing to proceed with it for his own account and to make use--at least on a de minimis basis--of ARP's office facilities to promote the concept. Supporting this testimony was evidence that Marcella's correspondence concerning RSG while he was a salesman for ARP was meager, that it was not kept secret but was filed at the front of the office correspondence binder kept by an employee of the Hill companies, and that telex messages concerning RSG were directed to Marcella at the office but were usually seen by Hill and his staff before they reached Marcella's desk since Marcella commuted to Manhattan from his home in Langhorn, Pennsylvania. In addition, a third-party witness testified that he, Marcella, and Hill had openly discussed RSG before the time of the April, 1980, conference when Hill claims to have uncovered Marcella's allegedly surreptitious activity with respect to RSG. Hill, on the other hand, claimed that Marcella had been disloyal to ARP and had developed RSG secretly and behind his back, using the name, prestige and letterhead(s) of both ARP and Westchester as well as their telephones, telexes, secretaries, and other office facilities. He claimed that the concept was a corporate opportunity of ARP.
 
 
 7
 ARP claimed that the buy-out agreement between Hill and Marcella effected an accord and satisfaction on the ground that the parties had intended to achieve a global resolution of their various differences, releasing "each other" from any and all claims between themselves both individually and as to their respective companies. Hill indeed testified that he had agreed on behalf of ARP to release its claims to RSG in exchange for a release by Marcella of his claims to commissions from ARP. The jury found, however, that the parties had not made any such agreement, that the buy-out agreement itself dealt only with the Westchester companies, and specifically that Marcella's commission claims against ARP were not waived nor were any claims of ARP against Marcella arising out of RSG. No specific interrogatory was directed to the jury as to whether ARP did in fact have a claim against Marcella arising out of RSG on the basis of the evidence.
 
 
 8
 ARP's amended answer had asserted four counterclaims against Marcella pertaining to RSG. ARP claimed that if the alleged accord and satisfaction were not found, ARP was entitled to a declaration that it owned RSG because Marcella had usurped a corporate opportunity and violated his exclusive services contract by developing RSG while an ARP salesman. ARP also sought money damages for the value of RSG, and for Marcella's use of ARP's personnel and facilities in developing RSG. But ARP did not allege in its answer that Marcella's commissions were forfeited because of disloyalty in developing RSG. When this case was before Judge Stewart, he dismissed ARP's counterclaims for failure to join the RSG co-investors and corporate entities as indispensible parties.
 
 
 9
 The jury found that there was a meeting of the minds on the essential terms of the commission agreement including renewals and future commissions after termination, which were not to be reduced from 15% and 12 1/2 to 5% as Hill had testified. The jury further found that the fair and reasonable value for commissions earned after Marcella's employment terminated was the commission percentages of the original contract, i.e., 15% and 12 1/2. It also found that the buy-out agreement was not intended as an accord and satisfaction. One question is whether in finding that the fair and reasonable value of Marcella's services equalled the value of commissions owed Marcella under the contract, the jury implicitly found against ARP on its claims to RSG since it concluded that Marcella had done nothing that would reduce the value of his services to ARP.[2] The jury also found that ARP was not liable for compensation on two barter deals in which one Libov handled the licenses and that Centaur was not liable for compensation on the "Rocket Robinhood" deal in which one Acton was involved.
 
 
 10
 In a post-trial order, Judge Pollack found against ARP on its claim that the statute of frauds barred enforcement of the commissions contract on the basis of Marks v. Cowdin, 226 N.Y. 138, 123 N.E. 139 (1919) and Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 110 N.E.2d 551 (1953), which held that separate related writings will suffice to meet the requirements of the statute. He also held that the jury's finding of an express agreement does not bar the effectiveness of its verdict for quantum meruit in the same measure that it found in its verdicts on the express agreement, relying on Silberberg v. Haber, 42 A.D.2d 552, 345 N.Y.S.2d 558, 559 (1st Dept.1973). He further held that the issue of alleged disloyalty of Marcella was resolved by the jury's findings against the defendant and therefore denied motions to set aside the verdicts and for judgment notwithstanding the verdict in all respects and entered judgment in the amounts above mentioned.
 
 DISCUSSION
 
 11
 ARP's statute of frauds claim is without merit. ARP's agreement to pay commissions as the jury found was evidenced by letters, checks, and commission reports, as well as ARP's pleadings and the pretrial order. The district court was perfectly correct in relying on Crabtree, 305 N.Y. at 54, 110 N.E.2d at 553: "The statute of frauds does not require the 'memorandum ... to be in one document. It may be pieced together out of separate writings, connected with one another either expressly or by the internal evidence of subject-matter and occasion.' " (quoting Marks v. Cowdin, 226 N.Y. at 145, 123 N.E. at 141). Crabtree took the position that "a sufficient connection between the papers is established simply by a reference in them to the same subject matter or transaction." 305 N.Y. at 54, 110 N.E.2d at 553. All of the terms of Marcella's contract entitling him to commissions at the rates found were spelled out through a comparison of the payments to him with corresponding commission reports and ledger cards. Moreover, in its pleadings and in the pretrial order ARP conceded an oral agreement in which Marcella would receive a percentage of revenues as ARP collected from television station licensees of the cartoon series over a period of years. See Cook v. Barr, 44 N.Y. 156, 160 (1870).
 
 
 12
 ARP argues, however, that the oral contract left unstated whether the commission percentages would apply after Marcella's employment was terminated. But ARP's contention is really based upon the proposition that, as Hill testified, the agreement contained a proviso that Marcella's commission rate would be reduced to 5% on any moneys that ARP received on account of Marcella's orders after Marcella terminated his employment. This claim at trial was contradictory to Hill's deposition testimony and ARP's pretrial claim that upon Marcella's departure he would be entitled to no compensation whatsoever. The contention was also inconsistent with the wholly uncontradicted expert testimony that the universal custom and practice in the industry was that payment of commissions continues after termination. ARP would require plaintiff to produce writings going beyond the terms of the agreement that he alleges for his prima facie case so as to negate a defensive contention that the agreement contained additional terms. Were this view to prevail, a defendant could always defeat a claim by alleging additional provisos that never existed and that are not an element of the plaintiff's claim, asserting them as an absolute bar to recovery. The question of future commissions is really nothing more than a factual question of the terms of the admitted contract, which the jury resolved against ARP. Thus, the statute of frauds issue is a non-issue, and the district court so found.
 
 
 13
 Beyond this, Marcella prevailed on his claim for quantum meruit. Thus, even if he were unable to recover on his contract claim by virtue of the statute of frauds, under New York law, "the general rule is that where an express contract is unenforceable by reason of the Statute of Frauds, there may still be recovery of the reasonable value of the services rendered." Silberberg v. Haber, 42 A.D.2d at 552, 345 N.Y.S.2d at 559. Plaintiff may quite properly submit his case on both theories. See Katcher v. Browne, 19 A.D.2d 744, 242 N.Y.S.2d 784, 786 (2d Dept.1963).
 
 
 14
 ARP's claim that somehow the buy-out agreement released Marcella's commission claims against ARP is almost too flimsy to mention. Indeed, aside from the fact that the contention was expressly rejected by the jury,[3] the defense might well have been stricken as a matter of law, for the Westchester agreement clearly had nothing whatsoever to do with ARP and makes no mention of either ARP or Marcella's commission claims. That is to say, the buy-out agreement dealt only with Hill and Marcella and the Westchester companies.
 
 
 15
 We come then to one of ARP's two major contentions, namely that it was entitled as a matter of law to a complete defense against any recovery of commissions by virtue of Marcella's disloyalty in preliminarily developing "Ready Set Go" on ARP-Westchester time and with ARP-Westchester facilities and equipment. Alternatively, ARP argues that it should at least be entitled to a new trial so as to assert this defense--which ARP claims it was prevented from raising because Judge Stewart dismissed its counterclaims before trial--on the grounds that the jury specifically found that ARP had not released its claims against Marcella arising out of RSG and that this finding and the directed verdict in Marcella's favor for unreduced commissions are so inconsistent as to require the grant of a new trial. Judge Pollack, in rejecting ARP's arguments, found that "[t]he issue of alleged disloyalty of the plaintiff was resolved by the jury's findings against the defendant." At trial, he had permitted ARP to demonstrate Marcella's disloyalty as part of its accord and satisfaction defense, note 2 supra. This defense alleged that Marcella surrendered his right to further commissions from ARP in return for ARP's surrender of its claims to ownership of RSG based on Marcella's usurpation of a corporate opportunity. Doubtless the jury rejected ARP's claim of a trade-off as fully charged because the buy-out agreement had no express reference either to RSG or to commissions from ARP. Only post-trial did ARP first argue that the disloyalty defense should have resulted in forfeiture of Marcella's right to commissions, though nothing in Judge Stewart's dismissal of ARP's counterclaims prevented ARP from raising the forfeiture claim as an affirmative defense at trial.
 
 
 16
 The forfeiture defense had many weaknesses on the merits, including the following: ARP continued to avail itself of Marcella's services after it conceded full knowledge of RSG, i.e., from April, 1980, to nearly a year later when Marcella left; it was entirely debatable whether the RSG promotion which was to be licensed to fast-food manufacturers rather than television stations was within ARP's line of business; Marcella was not employed by ARP as a creator or producer of programs but as a commissioned salesman; RSG had not been produced by the time Marcella left ARP, but was still in the development stage; and, finally, there was arguably independent testimony contradictory to Hill's testimony that he uncovered Marcella's allegedly clandestine efforts with respect to RSG in April, 1980. Thus, it is entirely possible that ARP urged the trade-off defense rather than the forfeiture defense at trial to avoid exposing the weakness of its forfeiture assertions, putting the pill in a sweetened container so to speak. In any event, ARP, having failed to raise the forfeiture defense in its answer (although not precluded by Judge Stewart from raising it), to ask that the jury be charged on the forfeiture defense, or to object to the charge given, may not be heard to raise the issue on appeal. List v. Fashion Park, Inc., 340 F.2d 457, 461 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); see also In re Alrac Corp., 550 F.2d 1314, 1318 (2d Cir.1977). Moreover, the claim of disloyalty was preserved on an accord and satisfaction theory, which permitted ARP to introduce substantial evidence of Marcella's alleged disloyalty. In finding that Marcella was entitled to no reduction in his contract rate of compensation on the quantum meruit count, "under all the facts and circumstances and how the parties acted in the past" (as Judge Pollack charged the jury), the jury found that Marcella had done nothing to reduce the value of his services and thus resolved the question of disloyalty against ARP.
 
 
 17
 ARP contends that it is at least entitled to a new trial because of the dismissal of its RSG counterclaims. Entirely aside from whether the counterclaims had merit (indeed so far as money damages were concerned ARP conceded at pretrial that RSG, being some $300,000 in the red, was a "disaster" or a "total loss"), we think the counterclaim seeking ownership of RSG was properly dismissed below for failure to join indispensable parties, i.e., Marcella's partners and corporations who had an interest in "Ready Set Go," under Fed.R.Civ.P. 19(b). See American Optical Co. v. Curtiss, 59 F.R.D. 644, 649-50 (S.D.N.Y.1973). Because the jury resolved the issue of disloyalty against ARP, ARP has no claim to the value of RSG (if any) or the de minimis value of ARP facilities used in developing RSG.
 
 
 18
 ARP's other serious claim is that Marcella's commissions on "New Spiderman" licenses are not yet due because ARP has not itself retained any commissions and will not do so until ARP remits $3,000,000 in license fees from television stations to Marvel Comics and Marcella's agreement, as he testified, was that he only had the right to his commission when ARP received its commission. But ARP conceded in the joint pretrial order that the oral agreement was that "Marcella would receive as ARP collected moneys from TV station licensees of the cartoon series over a period of years, a percentage of revenues so collected...." Exhibit 3 to Pretrial Order, Para. 13. There is no question that ARP did receive and is receiving its moneys from the television stations. That it proceeds to pay them to Marvel Comics under some arrangement to which Marcella was not a party does not mean that his commissions from ARP are not due and payable. It was receipt of moneys by ARP that made the commissions due and payable to Marcella. Moreover, ARP never asked that the jury be charged on this issue either in its request to charge or in its objections to the charge given.
 
 
 19
 Marcella raises six issues on cross-appeal. He argues that it was error for the judge to grant a directed verdict dismissing his claim for fraud and dismissing before trial his claim for intentional infliction of emotional distress and for prima facie tort. He also argues entitlement to a new trial on his contract and fraud claims for commissions on barter transactions. He asserts that the court's dismissal of his claim against Westchester was erroneous and he also contends that neither Centaur nor Westchester should have been awarded costs.
 
 
 20
 Marcella argues that his fraud claim made out a prima facie case that defendants falsely stated their intention to perform. See Adams v. Gillig, 199 N.Y. 314, 322, 92 N.E. 670, 672-73 (1910); Shapiro v. Dictaphone Corp., 66 A.D.2d 882, 884, 411 N.Y.S.2d 669, 672 (2d Dept.1978). Marcella testified that Hill promised him that ARP would pay Marcella a percentage of its revenues from foreign licensing to induce Marcella to reduce his commission rate from 20% to 15% but that ARP never paid him any such revenues. No evidence was presented showing that ARP had no intention of performing such a promise. A simple failure to perform promised acts is a breach of contract, not fraud. See Wegman v. Dairylea Cooperative, Inc., 50 A.D.2d 108, 113, 376 N.Y.S.2d 728, 734-35 (4th Dept.1975), appeal dismissed, 38 N.Y.2d 710, 382 N.Y.S.2d 1030, 346 N.E.2d 829 (1976). The most that can be said here is that the defendants did not perform; hence there is no separate claim in tort.
 
 
 21
 So too with the claim for intentional infliction of emotional distress based upon defendants' refusal to pay commissions. Emotional and mental distress is generally not compensable in a breach of contract action, see Boyce v. Greeley Square Hotel Co., 228 N.Y. 106, 111, 126 N.E. 647, 649 (1920), particularly in the absence of a physical injury. See Vanderburgh v. Porter Sheet Metal, Inc., 86 A.D.2d 688, 446 N.Y.S.2d 523, 525 (3d Dept.1982). It was the refusal to make payment that caused Marcella's emotional distress. This simply is not compensable.
 
 
 22
 Marcella argues that he has a triable claim for prima facie tort which may be asserted in the alternative with his emotional distress claim. See Sadowy v. Sony Corp., 496 F.Supp. 1071, 1076 (S.D.N.Y.1980). But where the infliction of harm is incidental to a defendant's primary business motive and not a significant part of a chosen plan of harassment, no cause of action for prima facie tort exists. See Costlow v. Cusimano, 34 A.D.2d 196, 199-200, 311 N.Y.S.2d 92, 95-96 (4th Dept.1970). The remedy of prima facie tort is available " 'when the intention to harm, as distinguished from the intention merely to commit the act, is present, has motivated the action, and has caused the injury to plaintiff, all without excuse or justification.' " Benton v. Kennedy-Van Saun Manufacturing and Engineering Corp., 2 A.D.2d 27, 28, 152 N.Y.S.2d 955, 957 (1st Dept.1956) (quoting Ruza v. Ruza, 286 App.Div. 767, 769, 146 N.Y.S.2d 808, 811 (1st Dept.1955)). In other words, the sole motivation for the damaging acts must have been a malicious intention to injure the plaintiff. When there are other motives, such as profit, self-interest, or business advantage, there is no recovery under the doctrine of prima facie tort. See Squire Records, Inc. v. Vanguard Recording Society, Inc., 25 A.D.2d 190, 191-92, 268 N.Y.S.2d 251, 253-54 (1st Dept.1966), aff'd, 19 N.Y.2d 797, 279 N.Y.S.2d 737, 226 N.E.2d 542 (1967).
 
 
 23
 Marcella argues that he is entitled to a new trial against ARP and Centaur for commissions on barter transactions in which a television station, instead of paying cash, exchanges advertising time for programing. He argues that the judge did not supply the jury with all the evidence it requested during its deliberations and did not allow it to consider his fraud claim with respect to those commissions. The jury did ask for "[e]xhibits (or other evidence) relating to barter deals in which Libov handled the licenses." The court sent the exhibits with the approval of counsel, but because the request was phrased in the alternative, the court found there was no necessity for the "other evidence," namely pages 67-70 of the transcript, consisting of Marcella's testimony. We agree with the judge; since the jury did not renew its request for other evidence there surely was no error in this respect.
 
 
 24
 Marcella testified that Hill had told him that he was not entitled to any commissions on these transactions because his companies had not received moneys from them. Marcella's claim is that this amounted to fraud since Hill conceded at trial that ARP and Centaur had received money from these barter deals. However, Marcella conceded in his direct testimony that he was paid the commission on the cash portion received on the barter deals; it was only on the barter portion that he was not paid.
 
 
 25
 The judge dismissed the claim against Westchester for recovery of the unpaid balance under the buy-out agreement. Westchester was not a party to the agreement even though it was, in Judge Pollack's words, one of Hill's "incorporated pocketbooks ... subject to his absolute bidding." While Hill had used Westchester as his agent to pay Marcella eleven of the first thirteen installments payable to him, he did not thereby cause it to assume joint and several liability with him for that obligation. In effect Marcella asks us not to pierce the corporate veil to hold the corporate principal Hill personally liable, but rather to do the opposite, i.e., to hold a corporate agent, an instrumentality, liable on the obligations of its principal. We see no reason to do this nor has Marcella cited us any authority in support of this proposition. Walkovszky v. Carlton, 18 N.Y.2d 414, 417-19, 276 N.Y.S.2d 585, 587-89, 223 N.E.2d 6, 7-9 (1966), the only case he does cite for this proposition, deals with the typical piercing of a corporate veil to hold the individual principal liable for the agent corporation's acts to prevent fraud or to achieve equity. While Marcella speaks of a sham Chapter 11 petition brought by Hill in the United States District Court for the Eastern District of Tennessee, Marcella's remedies will lie either in the bankruptcy court or in an attachment of Hill's assets, not in holding the corporation itself responsible for the acts of its principal.
 
 
 26
 We do agree with Marcella that neither Centaur nor Westchester should have been awarded costs against him because they filed counterclaims which were dismissed on the merits and therefore neither side prevailed. See Kropp v. Ziebarth, 601 F.2d 1348, 1358 & n. 27 (8th Cir.1979); Srybnik v. Epstein, 230 F.2d 683, 686 (2d Cir.1956).
 
 
 27
 Judgment affirmed in all respects save that of costs.
 
 
 28
 LUMBARD, Circuit Judge, concurring.
 
 
 29
 I concur in affirming the judgment of the district court and in vacating that part of the court's order awarding costs to Centaur and Westchester against Marcella, substantially for the reasons stated by Judge Oakes. I write separately to clarify our disposition of appellant ARP's counterclaims based on Marcella's alleged disloyalty.
 
 
 30
 ARP's counterclaims had alleged that Marcella's development of the program "Ready Set Go" while employed by ARP constituted disloyalty and theft of corporate opportunity, and that ARP was therefore entitled to damages based on the program's full value. Before trial, Judge Stewart dismissed the "Ready Set Go" counterclaim for failure to join indispensible parties; Judge Pollack, however, allowed ARP to assert the counterclaim at trial as an affirmative defense. Accordingly, ARP presented to the jury a theory that ARP had released its claim to "Ready Set Go" as part of the parties' accord and satisfaction of all their claims against each other. The jury rejected this interpretation of the evidence.
 
 
 31
 On appeal, ARP has raised for the first time the argument that Marcella's supposed disloyalty in creating "Ready Set Go" operates as a complete "unclean hands" defense to his claim for commissions. This shift in litigating strategy has the evident purpose of avoiding the jury's finding, in answer to a special interrogatory, that Marcella has earned and is entitled to quantum meruit in the full amount of his commissions. ARP argues in the alternative that, because Judge Stewart erroneously dismissed its counterclaims before trial, it was hampered in developing the disloyalty defense as a shield to liability and is at least entitled to a new trial.
 
 
 32
 Regardless of any basis for claiming error in any of the court's rulings involving the assertion of the disloyalty defense, the facts alleged to support it were presented ad nauseam to the jury. The jury disposed of these claims when they found that Marcella was entitled to the full amount of his commissions. The verdict is adequately supported by the evidence.
 
 
 
 [1]
 Defendant Centaur Distribution Co., Inc. was found not liable to Marcella by the jury. The claim against Westchester as Hill's agent was dismissed by the court before the case went to the jury
 
 
 [2]
 The court's charge on the trade-off defense as an accord and satisfaction was as follows:
 ARP has the burden of proving the trade off which the law calls an accord and satisfaction. To find in favor of ARP on this defense you must find that ARP has established by a fair preponderance of credible evidence: first, that ARP had good reasons to believe that Marcella while the President of Westchester had engaged in developing Ready, Set, Go on ARP's time, and that this involved a use of his position and the company's facilities that belonged to ARP and was reasonably claimed by ARP; second, that Marcella and ARP bargained for and reached an agreement whereby ARP relinquished its claims to Ready, Set, Go and Marcella relinquished his claims to compensation not yet payable because fees were not yet collected; third, either that the agreement is in writing and signed by Marcella or that Marcella received something of value or that ARP gave up something of value; and fourth, that the agreement was fully performed by ARP.
 
 
 [3]
 Did Marcella and Hill intend by their agreement of October 9, 1981 to release the other generally, from any and all claims, demands and everything else regarding each other, including:
 a) compensation claims against ARP, arising out of Marcella's employment, on moneys collected for use of the cartoons after the October 9, 1981 agreement?
 Yes No x tr
 (A-1694, p 4a).)