**Paul EDELMANN and Robert Schultz, residents of Florida and California, respectively, Plaintiffs,**

v.

**NATIONAL PATENT DEVELOPMENT CORPORATION and National Hydron Incorporated, both corporations of Delaware, Defendants.**

No. 85 Civ. 7926 (MP).

United States District Court, S.D. New York.

March 24, 1987.

Dominik & Saccocio, Miami Lakes, Fla. by Jack E. Dominik, Robert S. Levy, P.C., New York City by Larry Stopol, for plaintiffs.

Battle, Fowler, Jaffin & Kheel, New York City by David Fleischer, Neil E. McDonell, for defendants.

## MEMORANDUM GRANTING PARTIAL RELIEF UNDER RULE 56

MILTON POLLACK, Senior District Judge.

Defendants move for summary judgment on plaintiffs' claims under Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs allege breach of a licensing agreement, trademark infringement, unfair competition and fraud. For the reasons stated herein, the motion will be granted in part, and denied in part.

Plaintiffs Edelemann and Schultz are partners in Solarband Sports Associates, a New York partnership ("SSA"). On May 20, 1981 SSA and defendant MXL Industries, Inc., formerly National Hydron Incorporated ("MXL") entered a written license agreement (the "License Agreement"). Pursuant to the License Agreement SSA granted MXL an exclusive worldwide license to manufacture, use and sell a combination sweatband and sun visor product under certain patent rights owned by SSA.

SSA also purported to grant MXL the right to use the trademark "Solarband" in relation to the combination sweatband and eyeshield product (the "Product").

Defendant National Patent Development Corporation ("NPDC") was a guarantor of MXL's obligations under the License Agreement.

The complaint herein sets forth four claims: (1) a contract claim; (2) a trademark claim; (3) a claim of unfair competition; (4) a fraud claim; . Each will be treated herein.

### The Contract Claim

The License Agreement provided that MXL would pay SSA a royalty of 8.5% on

the first $5,000,000 of *net sales*[1] of the Product, and 7.5% on any net sale of Products over $5,000,000. Under the agreement, MXL also paid SSA a separate flat fee totalling $50,000.

MXL made its first sale of the Product in November 1981. During 1981–85 MXL paid royalties to SSA, Edelmann, and Schultz in the amount of $148,139.92 in addition to the original $50,000 flat fee.

In 1983 MXL decided to close out its inventory of the Product; there was no restriction against such a disposition of MXL's inventory in the License Agreement. On September 2, 1983 MXL and Deerfield Communications Corporation ("Deerfield"), a domestic barter and trading company, agreed on a sale and purchase of MXL's inventory of the Product for the nominal amount of $200,000, payable as follows: $50,000 upon the signing of the agreement, 25 cents per unit actually shipped, and delivery to MXL of barter credits of $3.00 per unit of the inventory delivered to Deerfield. The barter credits were exchangable by MXL for goods and services listed in the Deerfield catalog. Until exchanged, the credits were akin to a due bill.

MXL received from Deerfield $220,740.50 in cash upon tender of 882,962 units of the Product. Thereupon, MXL paid SSA in cash a royalty of 8.5%, or $18,762, calculated on the cash MXL had received in the close out. No royalty payment was made to SSA on the barter credits until they were actually utilized. When credits were used by MXL it paid SSA royalties of 8.5% per unit used based on the $3.00 per unit face value of the barter credits. To date, those royalty payments on utilized barter credits amounted to $1,363.99 which has been paid to SSA. The non-utilized barter credits remain to the credit of MXL in its account with Deerfield awaiting utilization.

The significance and value of the barter credits during the time that they continue unused and available for exchange are central to this litigation. The question posed is whether MXL is obligated to pay plaintiffs on the unexchanged and unused barter credits, or only when they are exchanged and utilized.

MXL's position is that the mere receipt of barter credits did not trigger an obligation then and there to pay royalties because the barter credits cannot be redeemed for cash, have no ascertainable value until utilized, and do not constitute a realized element of "net sales" as defined by the License Agreement.[2]

Plaintiffs contend that royalties became due to them under the License Agreement immediately on receipt of the barter credits based on their stated face value. The barter credits have a stated barter value of $3.00 per unit payable in merchandise. For tax purposes defendants have ascribed to the barter credits a value of ten cents per each dollar of their stated value.

Summary judgment "shall be rendered forthwith" if the papers submitted by the parties on the motion "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(e); *Celotex Corporation v. Catrett*, —— U.S. ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Where the "record taken as a whole," with inferences from underlying facts viewed in the light most favorable to the party opposing the motion, "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, —— U.S. ——, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Genuine material factual questions seem to remain at issue on plaintiffs contract claim including: whether the parties to the License Agreement intended or even considered royalties to be paid upon an exchange of the Product for value not im-

---

**1.** The License Agreement defined "net sales" as "the adjusted gross invoice price, the adjusted gross invoice price being the gross invoice price billed for Products, less cash discounts, any credits or allowances actually granted on ac-count of price adjustments or rejection or return of such products previously sold."

**2.** The normal wholesale cash price of the Product was $6.25 per unit.

mediately convertible into cash; whether the barter credits MXL received from Deerfield have an ascertainable value in the marketplace; and the actual market value of such barter credits if it is in fact ascertainable.

Defendants' reliance on *Marcella v. ARP Films, Inc.*, 778 F.2d 112 (2d Cir.1985) to support summary judgment in their favor is entirely misplaced. In *Marcella* the question of whether a party breached his contract by failing to pay sales commission on barter deals obtained by the salesman-plaintiff was a *question of fact* submitted to the jury. *Id.* at 116. The case did not hold as a matter of law that barter transactions do not immediately thereupon trigger a contractual duty to pay commissions.

Nor do the other cases cited by defendant prevent a barter transaction from constituting a sale upon which royalties may become immediately due under the License Agreement. While a "sale" is "ordinarily defined as a contract to give and to pass rights of property for money," the term is not necessarily "a word of fixed and invariable meaning" and depending on the intent of the contracting parties is "broad enough to include the transfer of property for any sort of valuable consideration." *Freund Motor Co. v. Alma Realty & Investment Co.*, 235 Mo.App. 587, 142 S.W.2d 793, 795 (Mo.1940).

The authorities cited by defendants themselves emphasize that the intention of the parties controls their agreement and must be gathered from the language of the contract in light of the facts and circumstances existing at the time of the execution of the agreement (here, the license). *See Papa Gino's of America, Inc. v. Broadmanor Associates, Ltd.*, 5 Conn. App. 532, 500 A.2d 1341 (1985).

Consequently, there must be a trial of the issue and defendant's motion for summary judgment on the contract claim must be denied without prejudice to a hearing thereon. At trial, both parties may present proofs on the commercial significance of the barter transaction, the parties' intentions, and any applicable custom in the relevant trade.

### The Trademark and Unfair Competition Claims

In the May 20, 1981 License Agreement SSA purported to grant MXL the right to use the trademark "Solarband." Thereafter, Solarband International, a corporation controlled by plaintiff Edelmann, applied for a trademark for the Solarband mark in conjunction with the Product on November 2, 1981. The application was not accepted by the Patent and Trademark Office until May 10, 1983.

On June 16, 1982 NPDC applied for a trademark for the mark "Sunbandit" in conjunction with the Product. This application was accepted on May 3, 1983.

At some point MXL began to mark the Product it manufactured as "Sunbandit." Plaintiffs assert that they had the right to prohibit MXL's sale of the product using the Sunbandit mark, and never approved such sale, and that MXL's use of the Sunbandit mark created confusion regarding the Product.

█ Plaintiffs' trademark and unfair competition claims lack validity. No specific facts are set forth in plaintiffs' papers from which a reasonable trier of fact could find that plaintiff had reserved to itself any right to control the manner in which MXL marked or sold Products manufactured under the patent rights licensed by plaintiffs. Although the contract granted MXL the right to use the Solarband mark, the contract certainly did not affirmatively obligate MXL to mark the Product as "Solarband."

Defendants' Rule 3(g) statement at ¶ 12 states that "SSA retained no control in the License Agreement over MXL's use of the trademark 'Solarband' or the manner in which the Product was sold." This statement was not controverted by plaintiffs in a 3(g) statement, and under the Rules is deemed to have been admitted as a statement of material fact as to which no genuine issue exists. *See* Rules of U.S. Dist. Ct. for Southern Dist. of N.Y. Civil Rule 3(g). Moreover, no specific facts have been set forth by plaintiff which dispute a right

on MXL's part under the License Agreement to sell the Product using any mark of its choosing.[3] No express or implied marking restrictions are contained in the License Agreement. Nor has any material issue of damages been raised on the alleged breach of plaintiffs' trademark rights. Plaintiffs received full royalties on Products sold bearing the Sunbandit mark.

The motion for judgment dismissing the trademark and unfair competition claims is granted.

### The Fraud Claim

Plaintiffs claim that they were fraudulently induced by defendants to enter the License Agreement. They maintain that defendants promised inflated advertising and royalties and then delivered no consumer advertising causing the Product not to achieve sales expectations. These alleged promissory contentions do not however sustain a fraud claim. No evidence is presented from which it appears that the conclusory promises were fraudulent and sufficient to sustain a claim of common law fraud. The allegations made in plaintiffs' proposed findings of fact do not satisfy the elements essential to a valid fraud claim.

Summary judgment is appropriate when conclusory allegations of fraud stand alone, unsupported by specific evidence pertinent to a claim of common law fraud. *Federal Deposit Ins. Corp. v. Borne*, 599 F.Supp 891, 895 (E.D.N.Y.1984); *Hotel Constructors, Inc. v. Seagrave Corp.*, 574 F.Supp. 384, 387–88 (S.D.N.Y.1983).

The facts set forth by plaintiffs might support, at most, a claim that defendants breached a promise. Such allegations do not amount to fraud. Plaintiffs' papers fail to designate "facts to show that the defendant[s], at the time the promissory representation was made, never intended to honor or act on [their] statement[s]." *Songbird Jet Ltd., Inc. v. Amax Inc.*, 581

F.Supp. 912, 925 (S.D.N.Y.1982), *aff'd*, 779 F.2d 39 (2d Cir.1985) (granting and affirming summary judgment for defendant on plaintiff's fraud claim).

The fraud claim is accordingly dismissed for insufficiency.

### Conclusion

The motion for summary judgment in favor of defendants on the contract claim is denied and trial thereon is scheduled for May 11, 1987 at 10 A.M. The motion for judgment on the trademark, unfair competition and fraud claims is granted and those claims are dismissed.

SO ORDERED.

---

3. In fact the papers suggest that it may be MXL and not SSA which owns the Solarband mark. "[R]ights in trademarks are not gained through discovery or invention of the mark, both only through actual usage ... To acquire ownership of a trademark, one must actually use the mark in the sale of goods or services." 1 J. McCarthy *Trademarks and Unfair Competition*, § 16.3 at 728 (2d ed. 1984). The only evidence before the court regarding actual usage of the mark concerns defendants' use of the "Solarband" mark in the sale of the Product. Plaintiffs have produced no evidence that they used the mark in the sale of goods or services.