**TWIN LABORATORIES, INC., Plaintiff,**

v.

**WEIDER HEALTH & FITNESS, a corporation; and I, Brute Enterprises, Inc., Defendants.**

**No. 89 Civ. 0949 (MBM).**

United States District Court,
S.D. New York.

Aug. 25, 1989.

David M. Malone (Lawrence B. Bernard, of counsel), Rivkin, Radler, Dunne & Bayh, Washington, D.C., for plaintiff.

Alan R. Malasky (Salvatore A. Romano, Joyce L. Bartoo and Jennifer A. Albert, of counsel), Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., and Anthony L. Tersigni and Meyers Tersigni Lurie, Feldman & Gray, New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Twin Laboratories, Inc. (Twinlab) a New York manufacturer of nutritional supplements used by bodybuilders, moves for reconsideration of that portion of a prior Opinion and Order granting defendants Weider Health and Fitness, a California manufacturer of bodybuilding supplements, and its wholly-owned California subsidiary, I, Brute Enterprises, summary judgment dismissing Twinlab's second claim, alleging essential-facilities monopolization. *Twin Laboratories, Inc. v. Weider Health & Fitness*, 89 Civ. 0949 (MBM), slip op. at 7–11, 1989 WL 85082 (S.D.N.Y. July 21, 1989); S.D.N.Y. Civ.R. 3(j). In addition, Weider renews its motion for summary judgment dismissing Twinlab's *prima facie* tort claim, the only claim to survive the previous summary judgment motion. Fed. R.Civ.P. 56(b). For the reasons discussed below, Twinlab's motion is denied, Weider's motion is granted, and the case is dismissed.

Twinlab owns and operates a bodybuilding magazine, *Muscular Development* but it advertised in every issue of Weider's two bodybuilding magazines, *Muscle & Fitness* and *Flex*. When Weider refused to run Twinlab advertising any longer, Twinlab sued, alleging that Weider monopolized and attempted to monopolize the bodybuilding supplements market, tortiously interfered with Twinlab's prospective economic advantage, and committed a *prima facie* tort. Weider successfully moved for summary judgment dismissing the antitrust and tortious interference claims, the last being dismissed without opposition. However, Weider's motion for summary judgment dismissing the *prima facie* tort claim was denied, because contrary to Weider's contention, Twinlab adduced sufficient evidence of special damages to support a jury verdict in its favor. Twinlab moves for reconsideration of that portion of the Opinion and Order that dismissed its essential facilities claim, and Weider renews its previously unsuccessful motion for summary judgment dismissing the *prima facie* tort claim, this time alleging that there is no evidence that Weider acted solely out of disinterested malevolence.

Turning to Twinlab's motion for reconsideration, originally the firm asserted that advertising space in Weider magazines is essential in order to create demand for its products. Although there seem to be other media through which Twinlab could advertise effectively, the parties do not dispute that the only possible way to advertise to bodybuilders is through bodybuilding magazines. Therefore, Twinlab sought to compel Weider to sell it advertising space on a nondiscriminatory basis. However, as indicated in the prior Opinion and Order, Weider could not be forced to share its advertising pages with its rivals unless those rivals would find it economically irrational to duplicate the advertising pages,

and potential entrants were severely handicapped by Weider's refusal to sell them advertising space. *Weider Health & Fitness*, slip op. at 9–10 (citing authority). "For example, if a magazine's advertising space were the only way a rival could reach its target audience and become an effective substitute, then the magazine's advertising space would be an essential facility." *Id.* at 10 (citing *Soap Opera Now, Inc. v. Network Publishing Corp.*, 88 Civ. 0984 (RJW), slip op. at 8 (S.D.N.Y. May 24, 1988)).

Twinlab's evidence could not meet these standards and therefore its claim was dismissed. As Twinlab conceded, its own magazine, *Muscular Development*, is "a reliable and cost-effective vehicle for reaching a wide range of [persons] who are willing to spend whatever is necessary to take better care of themselves." *Weider Health & Fitness*, slip op. at 10–11 (quoting Appendix to Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment (Defendants' Appendix) Exhibit 21 (*Muscular Development* Editorial Profile)). Twinlab now attempts distance itself from its admission by arguing that the Opinion and Order overlooked evidence that Twinlab was severely handicapped by Weider's refusal to sell Twinlab advertising space. Therefore, Twinlab urges reconsideration of the summary judgment dismissing the essential facilities claim. In effect, what Twinlab seeks to do is contradict itself late in these proceedings, hoping thereby to raise a genuine issue of material fact. *Cf. Reisner v. General Motors Corp.*, 671 F.2d 91, 93 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982).

As a preliminary matter, Twinlab ignores the fact that the essential facilities doctrine requires the firm to show initially that to duplicate Weider's advertising pages would be economically irrational. In fact, as shown in the prior Opinion and Order, it is economically rational to duplicate Weider's advertising to bodybuilders, and that is precisely what *Muscular Development* does. Slip op. at 10–11. Although the magazine's business director testified that *Muscular Development* was losing money and was

not meeting its circulation projections, he testified also that it was close to breaking even. Appendix to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Plaintiff's Appendix) Exhibit 26 (Deposition of Roy A. Ulin) at 154, 157. The magazine may not make money on its own, but it may still be, as the firm admits, a cost-effective way to advertise Twinlab products to at least some readers of Weider magazines—those who read Twinlab's magazine as well. However, once a court decides that the competitor has an effective alternative, the inquiry ends. As stated in the prior Opinion and Order, "[t]here are no barriers erected by Weider that Twinlab has not already surmounted." slip op. at 10.

Overlooking this deficiency and reaching the substance of the motion for reargument, Twinlab asserts that *Muscular Development* is an effective alternative only when considering the small segment of the market it currently reaches. On a motion for a preliminary injunction, where the record is not as fully developed, the relative circulation figures of a small, economically vulnerable newsletter and a large, wealthy magazine may suggest a sufficiently serious issue going to the merits of an essential facilities claim to warrant a preliminary injunction to preserve the status quo. *Soap Opera Now, Inc. v. Network Publishing Corp.*, 88 Civ. 0984 (RJW) (S.D.N.Y. May 24, 1988). However, more evidence is required in order to survive a motion for summary judgment.

In order to meet that burden, Twinlab argues that its small-circulation magazine is not an effective alternative to Weider titles that reach a larger number of customers for bodybuilding supplements. Twinlab does not argue that it cannot print enough copies of *Muscular Development* to reach every reader of *Muscle & Fitness* and *Flex*. Instead, Twinlab claims that it will be severely handicapped by its exclusion from Weider magazines because it will not be able to create a magazine good enough to dislodge Weider titles from their dominant position in the market. Therefore, Twinlab concludes that *Muscular De-*

*velopment* advertising pages will never become an effective substitute for Weider advertising pages because they will not be seen by as many purchasers of bodybuilding supplements.

When seen from Twinlab's point of view, the evidence suggests that Weider is the dominant force among bodybuilding magazines. However, that evidence does not indicate that the investment necessary to make *Muscular Development* as good and as widely read a magazine as *Muscle & Fitness* and *Flex* is economically irrational. There has been no evidence on the actual cost to Twinlab, either actual or projected, of making *Muscular Development* into the effective rival that Twinlab wishes it to be. The most that can be said after reviewing Twinlab's evidence is that it will be difficult to make *Muscular Development* into an effective rival, but not that it is economically irrational to do so.

In essential facilities cases, the issue is whether it would be economically or technologically impossible for a plaintiff to create a viable alternative to a rival's facility. The facility may be an arena suitable for professional basketball, a stadium suitable for professional football, a mountain suitable for recreational skiing, or a warehouse suitable for the trading of perishables. *Fishman v. Estate of Wirtz*, 807 F.2d 520, 540 (7th Cir.1987) (basketball arena); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1520–12 (10th Cir. 1984) (mountain), *aff'd on other grounds*, 472 U.S. 585, 600 & n. 26, 105 S.Ct. 2847, 2856 n. 26, 86 L.Ed.2d 467 (1985); *Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 992–93 (D.C.Cir.1977) (football stadium), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *Gamco, Inc. v. Providence Fruit & Produce Bldg. Inc.*, 194 F.2d 484, 487 (1st Cir.) (warehouse), *cert. denied*, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952). However, once the facility is built, the fact that no one uses it does not grant its owner the right to a rival's clientele. Yet that is precisely what Twinlab seeks to do here. In essence, Twinlab concedes that it owns the analogue of an arena, a stadium, a ski slope, or a warehouse, but asserts that the fans, the skiers, or the

traders do not want to use it. However, Twinlab has not asserted that it could not replicate its rivals' audience even if it invested a rational amount of money into the venture. Therefore, Twinlab's essential facilities claim must fail. Accordingly, Twinlab's motion for reconsideration of the prior Opinion and Order is denied, and the portion of the Opinion and Order granting Weider summary judgment dismissing the essential facilities claim is adhered to.

■ As for Weider's motion for summary judgment, contrary to Twinlab's contention, renewed motions for summary judgment are not motions for reconsideration, are therefore are not limited to "matters or controlling decisions which counsel believes that the court has overlooked." S.D.N.Y. Civ.R. 3(j). Instead, a second motion may be made as long as it is supported by new material. *Lindsey v. Dayton–Hudson Corp.*, 592 F.2d 1118, 1121 (10th Cir.), *cert. denied*, 444 U.S. 856, 100 S.Ct. 116, 62 L.Ed.2d 75 (1979); 6 J. Moore W. Taggart & J. Wicker, *Moore's Fed. Prac.* ¶ 56.14[2] (2d ed. 1988). Moreover, the standards set forth in the prior Opinion and Order regarding summary disposition are applicable equally here. *Weider Health & Fitness*, slip op. at 2–3.

In order to avoid summary judgment dismissing its *prima facie* tort claim, Twinlab must prove that Weider intentionally inflicted harm on Twinlab, without excuse or justification, by a series of acts that otherwise would be lawful, thereby causing Twinlab special damages. *E.g., Chen v. United States*, 854 F.2d 622, 627 (2d Cir. 1988); *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 142–43, 480 N.E.2d 349, 354–55, 490 N.Y.S.2d 735, 740–41 (1985).

■ In addition to requiring that the acts be lawful, New York requires that the acts be motivated solely by disinterested malevolence. *American Bank & Trust Co. v. Federal Reserve Bank of Atlanta*, 256 U.S. 350, 358, 41 S.Ct. 499, 500, 65 L.Ed. 983 (1921) (Holmes, J.); *Chen*, 854 F.2d at 629 (citing authority); *Durham Indus., Inc. v. North River Ins. Co.*, 673 F.2d 37, 40 (2d Cir.) (same), *cert. denied*, 459

U.S. 827, 103 S.Ct. 61, 74 L.Ed.2d 64 (1982); *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 333, 451 N.E.2d 459, 468, 464 N.Y.S.2d 712, 721 (1983) (same). In the words of Justice Holmes, a *prima facie* tort occurs when harm is inflicted "for the sake of the harm as an end in itself, and not merely as a means to some further end legitimately desired." *Aikens v. Wisconsin,* 195 U.S. 194, 203, 25 S.Ct. 3, 5, 49 L.Ed. 154 (1904). Similarly, the Court of Appeals has determined "that the genesis which will make a lawful act unlawful must be a malicious one unmixed with any other and exclusively directed to injury and damage of another." *Beardsley v. Kilmer,* 236 N.Y. 80, 89–90, 140 N.E. 203, 206 (1923). For example, "[w]hen there are other motives, such as profit, self-interest, or business advantage, there is no recovery under the doctrine of *prima facie* tort." *Marcella v. ARP Films, Inc.,* 778 F.2d 112, 119 (2d Cir.1985). In a business context such as this one, this normally would end the inquiry, as businesses are presumed to act in their own selfish interest. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1985) (claims that make no economic sense must be supported by more evidence than otherwise would be necessary). Here, it seems obvious that Weider acted out of what it perceived as its own self-interest in rejecting its competitor's advertising. The precise components of such a motivation—how much desire to avoid competition with Weider's own product, what degree of concern that Twinlab's advertising was misleading, and the like—are less important than the self-interest they add up to. However, looking beyond this specific context, the general rule is that where the public gains more from the action than the individual loses, or where policy considerations dictate that an act should not become the basis for liability, the injured party cannot recover under a *prima facie* tort theory. *House of Materials, Inc. v. Simplicity Pattern Co.,* 298 F.2d 867, 872 (2d Cir.1962) (policy considerations); *ATI, Inc. v. Ruder & Finn, Inc.,* 42 N.Y.2d 454, 459, 368 N.E.2d 1230, 1233, 398 N.Y.S.2d 864, 867 (1977) (cost-benefit analysis). Therefore, a supplier may terminate a dealer in retaliation for being sued, so long as the suit does not allege an illegal refusal to deal. *Simplicity Pattern Co.,* 298 F.2d at 869, 872–73. Similarly, a professional association of accountants may condemn public utility accounting practices in an effort to maintain the standards of the profession. *Appalachian Power Co. v. American Inst. of Certified Pub. Acct.,* 268 F.2d 844 (2d Cir.) (*per curiam*), *cert. denied,* 361 U.S. 887, 80 S.Ct. 158, 4 L.Ed.2d 121 (1959).

In this motion, the parties dispute whether Twinlab has adduced evidence that Weider's conduct was motivated solely by disinterested malevolence. Twinlab asserts that Weider has come up with six excuses for its conduct, all of which are pretextual. Twinlab concludes that this alone is evidence of disinterested malevolence.

Even if Twinlab's legal theory were correct, and a jury could find disinterested malevolence based on evidence that defendants' excuses were pretextual, Twinlab is incorrect in its assertion that all six grounds for termination have been rebutted by record evidence. In fact, there is uncontradicted evidence that Weider terminated Twinlab for at least one legitimate reason.

In his deposition, Joseph Weider accused Twinlab of being the most aggressive among his competitors in using false advertising; and he also accused the firm of becoming even more aggressive in employing misleading marketing techniques. Plaintiff's Memorandum in Opposition to Defendants' Renewed Motion for Summary Judgment (Plaintiff's Memorandum) Exhibit 1 (Deposition of Joseph Weider) at 76–77. Although Mr. Weider did not discuss this conclusion with everyone in his organization, *id.* at 112–13, that does not mean that it was not a reason for Weider's refusal to carry Twinlab advertising. In addition, contrary to Twinlab's contention, Mr. Weider's remarks are not contradicted by the testimony that Twinlab's advertising has the highest production values. Plaintiff's Memorandum Exhibit 5 (Deposition of John Heagle) at 204. It is entirely possible that

**36**

Twinlab's advertisements are both aesthetic and misleading. Moreover, contrary to Twinlab's assertion, the testimony of Bruce Loria, Weider's national advertising director, does not contradict Mr. Weider's testimony. Loria testified that in the summer of 1988, he called on Twinlab and told them that he appreciated their business. Plaintiff's Memorandum Exhibit 3 (Deposition of Bruce Loria) at 132–33. However, a statement of that generality is does not contradict Mr. Weider's concern that the advertising, although valuable, was misleading. In addition, Loria's statement that he could come up with no logical explanation for Twinlab's exclusion from Weider magazines, when read completely, in context, and in the light most favorable to Twinlab, proves merely that Loria had no idea why Twinlab had been terminated. Deposition of Bruce Loria at 228–29. It cannot be read to indicate that the advertising manager knew the actual reason for Twinlab's termination, and that the reason made no economic or business sense. Therefore, it does not contradict Mr. Weider's assertion that Twinlab was terminated because its advertising was the most deceptive in the industry, and was widening its lead in this dubious category.

Mr. Weider's uncontradicted reason for terminating Twinlab is certainly a legitimate and responsible business decision, and Weider should not be held responsible for any damage that occurred because of it. With that determination, however, it becomes impossible for Twinlab to assert that Weider's sole motivation was disinterested malevolence. Therefore, summary judgment is granted dismissing Twinlab's fifth claim against Weider for *prima facie* tort. As each of Twinlab's claims against defendants has been dismissed, the case is dismissed.

SO ORDERED.