David R. KIDWELL, Plaintiff,

v.

BOARD OF COUNTY COMMIS-
SIONERS OF SHAWNEE
COUNTY, Defendant.

No. 96–4112–SAC.

United States District Court,
D. Kansas.

Sept. 22, 1998.

Brenda L. Head, Davis, Unrein, Hummer, McCallister, Biggs & Head, L.L.P., Topeka, KS, for plaintiff.

Larry G. Karns, Glenn, Cornish, Hanson & Karns, Chtd., Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This employment discrimination case comes before the court on the defendant's motion to reconsider (Dk.72), the defendant's motion for summary judgment (Dk.75), and the defendant's motion to review the magistrate judge's order (Dk.95). The plaintiff has filed a written opposition to the defendant's motion for summary judgment. (Dk.90). The court considers these pending motions ready for ruling.

**MOTION TO RECONSIDER (Dk.72).**

The defendant asks the court to reconsider its order denying the defendant's motion to dismiss and to allow the defendant to submit additional evidence in support through its motion for summary judgment. (Dk.72). According to the defendant's motion to reconsider, the defendant's counsel telephoned the district judge's chambers on September 1, 1997, asking that the motion to dismiss not be decided as he would be filing a summary judgment motion which would incorporate the motion to dismiss. The defendant's counsel states that he was "assured the Motion to Dismiss would not be ruled on" and relied on the same in not supplementing its motion to dismiss. (Dk.72, p. 2).

On September 30, 1997, the court filed its order denying the defendant's motion to dismiss. In seeking reconsideration, the defendant argues it has new evidence "obtained through discovery" after filing "its Motion to Dismiss ... that directly pertains" to prior arguments and that this evidence was never considered by the court in its prior ruling. (Dk.72, p. 2). The defendant notes that Fed.R.Civ.P. 12 permits a court to treat a motion to dismiss as a motion for summary judgment when matters outside the pleadings are presented. The defendant says it has evidence that many of the alleged discriminatory events occurred more than 300 days before August 1, 1995, and that the Equal Employment Opportunity Commission ("EEOC") "never received any alleged 'charge letters' from plaintiff in August 1995." (Dk.73, p. 3). The plaintiff has not filed any response.

As the rules of this court provide, "[a] motion to reconsider shall be based on (1) an intervening change in controlling law, (2) availability of new evidence, or (3) the need to correct clear error or prevent manifest injustice." D.Kan.Rule 7.3. A court's rulings "are not intended as first drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Alloy Casting Co. v. Gulfco Industries, Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988). A motion to reconsider is appropriate if the court has obviously misapprehended a party's position, the facts, or applicable law, or if the party produces new evidence that could not have been

obtained through the exercise of due diligence. *Comeau v. Rupp*, 810 F.Supp. 1172, 1175 (D.Kan.1992); *see Refrigeration Sales Co., Inc. v. Mitchell–Jackson, Inc.*, 605 F.Supp. 6, 7 (N.D.Ill.1983), *aff'd*, 770 F.2d 98 (7th Cir.1985). A motion to reconsider is not appropriate if the movant only wants the court to revisit issues already addressed or to hear new arguments or supporting facts that could have been presented originally. *Comeau v. Rupp*, 810 F.Supp. at 1175. If advanced for improper purposes, a motion to reconsider " 'can waste judicial resources and obstruct the efficient administration of justice.' " *Peoples Nat. Bank v. Purina Mills, Inc.*, 946 F.Supp. 889, 891 (D.Kan.1996) (quoting *United States ex rel. Houck v. Folding Carton Administration Committee*, 121 F.R.D. 69, 71 (N.D.Ill.1988)).

■ The defendant's motion to reconsider is without merit.[1] In denying the motion to dismiss, the court treated it as a Rule 12(b)(6) motion and considered only the evidence and arguments presented there. This order and the ruling therein does not preclude the defendant from filing a subsequent motion for summary judgment with the same arguments but with additional evidence. "A second motion for summary judgment is proper after a prior motion is dismissed, if supported by new material." *Lindsey v. Dayton–Hudson Corp.*, 592 F.2d 1118, 1121 (10th Cir.) (citations omitted), *cert. denied*, 444 U.S. 856, 100 S.Ct. 116, 62 L.Ed.2d 75 (1979); *see American Nurses' Ass'n v. State of Ill.*, 783 F.2d 716, 729 (7th Cir. 1986); *Twin Laboratories Inc. v. Weider Health*, 720 F.Supp. 31, 34 (S.D.N.Y.1989),

*aff'd*, 900 F.2d 566 (2nd Cir.1990); *Kenyatta v. Moore*, 623 F.Supp. 220, 222 (D.Miss. 1985). The defendant is not prejudiced by the court's prior order denying its motion to dismiss. If the defendant actually presents additional material evidence to support its latest motion, the court will consider and decide the same without regard to its earlier ruling. Consequently, the court denies the defendant's motion to reconsider.

## MOTION FOR SUMMARY JUDGMENT (Dk.75).

The defendant originally submitted a memorandum in violation of the court's rule on page limitations. This rule appears not only in the court's scheduling order (Dk.15) in this case but also in the *Federal Practice Handbook 2d ed. for the United States District Court for the District of Kansas* which are available from the clerk's office and also in Judge Crow's *Civil Procedural Guidelines* (rev.1/10/1997) which are found in the handbook or are separately available from the clerk's office or chambers. On dispositive motions, Judge Crow imposes page limitations and also requires the following:

> B. Briefs and appendices may be produced by standard typographic printing or by any duplicating or copying process which produces a clear black image on white paper. Text produced by word processor or typewriter shall be no smaller than 12 point font with margins no smaller than one inch (1″) and with double spacing between each line of

---

**1.** It is unfortunate if the defendant's counsel mistakenly believed after his telephone call to chambers that the judge would withhold ruling on the pending motion to dismiss. The judge's staff appropriately viewed the defendant's counsel's call as an ex parte and informal contact meant only to inform staff of counsel's intent to file a later summary judgment motion. Staff understood counsel to say that he would be following the magistrate judge's recommendation and would not be supplementing his current motion but would be filing another motion that involved some of the same issues but that included additional evidence. In such a setting as this, it is neither the practice nor the proper procedure of this chambers to make any "assurances" about the court's actual handling of a pending motion. To the best of the staff's recollection, none was made here. The court, however, apologizes if the defendant's counsel left that conversation with the mistaken impression that he had made a request certain for court action and that the same had been fully submitted and/or granted.

text. Quotations in excess of three lines shall be indented. Footnotes shall be no smaller than 12 point font. Indented quotations and footnotes may be single spaced.

C. No attempt shall be made to circumvent the page limitations established by the court through the piecemeal filing of motions or by the filing of supplemental memoranda not advancing new authority.

*Civil Procedural Guidelines* I. Dispositive Motions. The defendant's current memorandum in support of its motion for summary judgment has side and bottom margins of less than one inch in violation of the above rules. Rather than striking this memorandum and requiring the defendant to make a third attempt at complying with these requirements, the court chooses only to admonish the defendant's counsel to review all applicable rules before filing another dispositive motion in this court.

The defendant advances numerous grounds for summary judgment but its discussion of the applicable law and relevant facts is lacking. Some arguments are so vague that the court is not quite sure what issue is before it. The court neither is inclined nor has the time at its disposal to properly address all matters that have been presented. For that reason, the court will limit its order only to those matters that frankly are worth discussing because they are case dispositive.

### A. Summary Judgment Standards

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir. 1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the

just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

Summary judgments are "used sparingly in employment discrimination cases." *Hardin v. Hussmann Corp.,* 45 F.3d 262, 264 (8th Cir.1995). Because discrimination claims often turn on the employer's intent, courts ordinarily consider summary judgment inappropriate to settle an issue like intent, *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 530 (10th Cir.1994); *see Courtney v. Biosound, Inc.,* 42 F.3d 414, 418 (7th Cir.1994) ("[T]he summary judgment standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." (quotation and citation omitted)). Even so, summary judgment is not "per se improper," *Washington v. Lake County, Ill.,* 969 F.2d 250, 253 (7th Cir.1992), and may be useful in weeding out claims and cases obviously lacking merit, *Summers v. State Farm Mut. Auto. Ins. Co.,* 864 F.2d 700, 709 (10th Cir.1988), *overruled on other grounds, McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).

## B. *Statement of Uncontroverted Facts*

For purposes of this motion only, the court considers the following to be the uncontroverted facts relevant to its ruling:

1. In 1994, the defendant Board of County Commissioners of Shawnee County ("Shawnee County") employed the plaintiff David R. Kidwell ("Kidwell") as a corrections specialist at the Shawnee County Jail ("Jail"). Kidwell was exposed to second-hand smoke while he worked at the Jail.

2. In his second-amended complaint, the plaintiff alleges that from April through July 8, 1994, he repeatedly requested a transfer to a smoke-free unit at the Jail, and his requests were denied. In his deposition, Kidwell testified that he had worked in Jail's W module since 1987 and that he had asked several times for a transfer from the W module. (Kidwell Dep., pp. 45–46). Kidwell was also asked at his deposition whether he had testified at a prior unemployment compensation hearing that he had never requested a transfer from the W module. (Kidwell Dep. pp. 47–48, 76). Kidwell agreed that he had so testified at the unemployment compensation hearing. (Kidwell Dep. pp. 47–48). Later in his deposition, Kidwell was asked again about this prior testimony and he explained that no transfer was requested because "they came up and chopped a big hole in the wall and they put these exhaust fans in and said this would help it." (Kidwell Dep. p. 76).

3. Kidwell's primary care physician, Dr. Rhoads, wrote a note dated July 8, 1994, indicating the plaintiff was unable to work for medical reasons. At that time, Kidwell told others at the Jail that he didn't know if he would be returning, and he told the Jail Administrator, Tom Merkel, that he didn't think he would ever return to work. At that time, Merkel knew that the plaintiff's health problems had been ongoing for several years. Merkel testified that the plaintiff's health problems appeared to be serious at times.

4. To receive a salary during his absence, Kidwell was permitted to exhaust his sick leave and accrued vacation. In August 1994, Kidwell had depleted all of his paid leave. Merkel wrote Kidwell a letter dated August 15, 1994, advising:

> You will remember that we talked a few weeks back regarding a leave of absence request. You now need to do that if you desire. You have now used all your paid leave and will receive one more check for about 20 hours.

Please return something to me as soon as possible. Thanks!

(Dk.82, Ex. 1). Though the Union contract provides for a six-month leave of absence, the plaintiff never responded to Merkel's letter and never requested a leave of absence.

5. To address its staffing needs, the Jail asked Shawnee County for authority to hire for the plaintiff's vacant position. Vacancies in the correction specialist position occur regularly because of the turnover in that position.

6. On August 22, 1994, the plaintiff, through his attorney, Allen Ternent, filed a claim for workers' compensation benefits alleging exposure to second-hand smoke. The Risk Management Department of the City of Topeka administers workers' compensation claims brought by Shawnee County employees. If an employee with a pending workers' compensation claim is off work based on a physician's recommendation, the employee may not return to work without furnishing a physician's release to their supervisor and to Risk Management. Risk Management evaluates whether the release is restricted or full and determines along with the specific department whether the employee can perform their job with appropriate accommodations or not. The plaintiff's attorney told Risk Management in August or September of 1994 that Kidwell's condition appeared terminal.

7. In the Fall of 1994, Kidwell learned that the Jail would be following a smoke-free policy beginning November 1, 1994. Kidwell requested a work release from his physician. Dr. Rhoads gave him a release dated October 19, 1994, that stated: "I am releasing David Kidwell to resume work at the Shawnee County Department of Corrections as of November 1, 1994, when the work environment will be smoke-free." (Dk.82, Ex. 3).

8. The plaintiff has testified that he took the release letter to the Jail. At the unemployment hearing, the plaintiff testified that he was not certain to whom he delivered the letter. In his deposition in this case, the plaintiff testified he gave the letter to a secretary named "Shirley."

9. Shirley Sharpnack, a secretary at the Jail, has averred that she did not receive in October of 1994 "a return to work release from a physician for or from David Kidwell." (Dk.82, Ex. 5). Tom Merkel has testified that he did not see the plaintiff's work release until December of 1994, when he reviewed a copy of the unemployment claim and petition filed by Kidwell.

10. Kidwell's attorney, Allen Ternent, testified that he telephoned Merkel to determine if Kidwell could return to work and what jobs would be available. Ternent recalls Merkel saying either that Kidwell "couldn't come back because a [workers' compensation] claim had been filed or that he didn't think [Kidwell] could come back because a claim had been filed." (Dk. 82, Ternent Dep. p. 36). Ternent also recalls Merkel saying that he would "talk to the folks in risk management to ascertain whether he [Kidwell] could come back or not." *Id.* Ternent did not send Kidwell's work release to Merkel or to anyone at the Jail.

11. In his deposition, Merkel recalls this telephone call from Ternent but remembers telling Ternent that Kidwell could return to work after Merkel received a work release on Kidwell and after "the risk management folks [were contacted] regarding David's workers' comp situation." (Dk. 82, Merkel Dep. p. 41). The defendant anticipated Kidwell's release, for the minutes from the lieutenants' meeting held October 18, 1994, show that Captain Greene announced "that David Kidwell will return from medical leave on or about November 1st." (Dk.82, Ex. 17).

12. Around the last week of October of 1994, Ternent called the Jail on behalf of Kidwell and left the message for Merkel that Kidwell "was not going to be able to return" to work during the first part of November. Kidwell had asked Ternent to make this call because Kidwell had just learned that "he still physically was unable

to exert himself and he was concerned that there wouldn't be anything that he could do at the jail." (Dk. 82, Ternent Dep. pp. 39–40). Kidwell did not go to work or contact the jail on November 1, 1994.

13. Kidwell submitted a resignation dated November 14, 1994, which stated: "Effective 11–14–94, I regretfully resign my position with the Shawnee Co. Department of Corrections. I am resigning because of the detrimental affect (sic) the smoke filled environment has had on my health." (Dk.82, Ex. 12).

14. The plaintiff testified that he resigned in order to access his Kansas Public Employees Retirement System ("KPERS") benefits and to draw unemployment compensation benefits. Before resigning, Kidwell told his attorney, Ternent, that he was financially devastated and that he needed to access his KPERS account and that he was considering applying for unemployment compensation benefits and Social Security disability benefits. Ternent advised him that his written resignation should document his specific reasons for leaving.

15. At the workers' compensation preliminary hearing held December 18, 1995, Kidwell testified that he "voluntarily terminated" his position at the Jail. At the unemployment compensation hearing held January 9, 1995, Kidwell testified that he quit his job and that he did not return to work following his release because Merkel "told me I couldn't come back because I

had a workman's comp. claim pending." (Dk. 82, Employment Security Bd. of Review Trans. p. 3). At that hearing, Kidwell also testified that he did not attempt working at the jail after his release because he would not have known his assigned shift.

16. After the unemployment compensation hearing, Merkel told Kidwell that anytime he wanted a job at the Jail he should fill out a job application. Kidwell did not follow this advice and submit a job application.

17. In March of 1995, Kidwell's attorney, Ternent, contacted Merkel about Kidwell returning to work. By letter to Ternent, Merkel informed them that Kidwell should apply for employment at the Jail. After reading a copy of this letter, Kidwell did not apply for a position at the Jail.[2]

18. In his deposition, Kidwell testified that he did not know what he considers to be his disability for purposes of his ADA claim. In his most recent affidavit, Kidwell avers that in July 1994 he "suffered from a serious medical condition which has been described as 'carcinoid syndrome' which resulted in difficulties in breathing and inability to work." (Dk.90, Ex. 2, ¶ 6).

19. Before November 16, 1994, the plaintiff was confident his physician would document a medical condition that would be helpful in obtaining Social Security disability benefits. By letter dated Novem-

---

**2.** The plaintiff purports to controvert this sentence by his averment that: "After my constructive discharge from Shawnee County Jail, I attempted to reapply for a position at the Jail and was refused the application." (Dk. 90, Kidwell Affidavit No. 2). The plaintiff, however, testified in his deposition that he had read Merkel's letter of March 29, 1995, advising him to apply for employment at the Jail and that after reading the letter he did not apply for any position at the Jail. The plaintiff makes no effort to reconcile this apparent contradiction between his testimony and affidavit or to give any explanation for it. The wording in the plaintiff's affidavit is both vague and conclusory. The court is unsure what the plaintiff means by saying that he "attempted to reapply" or what this means the plaintiff actually did. Nor does the court understand what the plaintiff means by saying he "was refused the application." Was he denied an application form to complete or did he submit a completed form and was that application denied? The affidavit does not provide any specific facts about this "attempt" to apply. Affidavits offering only " 'conclusory allegations without specific supporting facts have no probative value.' " *Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990) (quoting *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985)). The court concludes that the plaintiff's averment does not properly controvert the above sentence.

ber 16, 1994, Dr. Rhoads wrote Ternent about Kidwell's current medical condition:

> David has respiratory problems of an unknown nature, probably due to bronchial carcinoid condition. This situation was aggravated by the intense smoke at his work place, which he had to inhale throughout most of the day.
>
> I do believe that David can work and that he can go on to pursue other work if necessary. I do not believe that he is disabled to return to work completely at this time or in the future.
>
> The patient may have some endurance problems in terms of more physical type of work, but otherwise I feel that he is quite capable of continuing to work in some capacity in the future.

(Dk.82, Ex. 9). Since 1994, the plaintiff has been periodically employed. He has worked in a home furnishings store and as the chief of police in Kanawha, Iowa.

20. The plaintiff avers that around August 1, 1995, he mailed certified letters to the Equal Employment Offices in Kansas City, Kansas and in Kansas City, Missouri. The letter references Kidwell's employment at the Jail, his requests for accommodation in a smoke-free environment, his supervisors' refusal to transfer, his absence for medical reasons in July of 1994, and the Jail's refusal to re-employ him on November 1, 1994, after his physician released him for work in the Jail's smoke-free environment. The letter concludes with Kidwell's allegation that he had "been discriminated against because of" his disability. (Dk.82, Ex. 15). The plaintiff has produced return receipts showing letters were delivered to the EEOC office in Kansas City, Missouri on August 1, 1995, and to the EEOC office in Kansas City, Kansas on August 3, 1995.

21. The plaintiff avers that following his initial letter he made several long-distance telephone calls to the EEOC in August and September of 1995. The plaintiff further avers that on September 8, 1995, Chuck Dulin with the EEOC interviewed him for more than three hours over the telephone. From this conversation, Kidwell believed he had filed a discrimination complaint and that the EEOC would be investigating it.

22. Pantoleon Florez, an attorney representing Kidwell in the unemployment compensation matters, wrote the EEOC a letter dated September 14, 1995. The letter reads in relevant part:

> This letter will confirm our telephone conversation of this morning wherein we discussed the timeliness of Mr. Kidwell's attempted filing with the EEOC on his claim of failure to accommodate a medical condition.
>
> It is my understanding that Mr. Kidwell made contact with you in either late July or early August regarding his desire to file a charge of discrimination against the Shawnee County Department of Corrections under the ADA. I have enclosed herein a copy of a letter that was sent to me by Mr. Kidwell received August 7, 1995 addressed to the EEOC.... It is my understanding that his contact prior to the expiration of the 300 days from the last attempt to return to his job with accommodations, was within the 300 day period for filing. Thus, his contact would make a subsequently executed verified complaint timely under case law and I believe EEOC regulation....
>
> ....
>
> On behalf of Mr. Kidwell I would request that a formal complaint be initiated based upon these allegations and a formal determination be made by the EEOC as to the timeliness of Mr. Kidwell's attempt to file a charge in early August of this year....

(Dk.82, Ex. 13).

23. Kidwell later submitted a signed and verified charge of discrimination that was dated March 8, 1996, and assigned the charge number of 281 96 0512. This charge alleges that between April and July 8, 1994, Kidwell "continuously requested" transfers to a smoke-free assignment due to a medical condition, but his requests

were denied. The charge further alleges that Shawnee County refused to rehire him after his physician released him on November 1, 1994, which led to his constructive discharge "on approximately November 15, 1994." (Dk.82, Ex. 10).

24. The EEOC on March 27, 1996, dismissed charge number 281 96 0512, because it "was not timely filed with the Commission, *i.e.*, you waited too long after the date(s) of the discrimination you alleged to file your charge." (Dk.82, Ex. 16).

25. The Kansas Human Rights Commission ("KHRC") sent Kidwell a letter dated March 25, 1996, stating that the KHRC would not file his employment discrimination complaint that had been forwarded by the EEOC as it was filed more than six months "since the last alleged date of incident." (Dk.82, Ex. 18). Kidwell testified that he did not have any other direct contact with the KHRC regarding these discrimination charges.

26. Shawnee County had posted a Family Medical Leave Act ("FMLA") notice in its Human Resources Office as of July 8, 1994, when Kidwell was taken off work by his physician. Kidwell, however, avers that the Jail never advised him of his rights under the FMLA and, in particular, his right to return to his former position after a medical leave of absence as provided under the FMLA. He further avers that the Human Resources Office is not part of the Jail but is housed in a separate building.

C. *Claims*

In his opposition to summary judgment, the plaintiff describes his action as follows:
This is a perceived disability discrimination claim brought under Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101, a reverse race discrimination claim brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and a violation of the Family Medical Leave Act, 29 U.S.C. § 2601, et seq., wherein the plaintiff also claims he was retaliated against and constructively

discharged for filing a worker's compensation claim.
(Dk.90, p. 8). The plaintiff concedes that he is unable to prove a prima facie case of reverse race discrimination and that summary judgment is appropriate on this claim.

As alleged in his second amended complaint, the plaintiff's ADA claim is based on two discriminatory events. First, "the Jail refused to make the requested reasonable accommodation of transferring David Kidwell to a smoke-free unit during April of 1994 through July 8, 1994, as requested." (Dk.62, ¶ 21). Second, "the Jail refused David Kidwell's return to work on November 1, 1994, and constructively terminated him on November 15, 1994, due to their perception of his disability in violation of 42 U.S.C. § 12111." (Dk.62, ¶ 22). On his state-law retaliatory discharge claim, the plaintiff alleges in his second amended complaint that the Jail refused his return on November 1, 1994, and continued to refuse his return in retaliation for his filing of a worker's compensation claim. (Dk.62, ¶¶ 28–30). On his claim under the Family Medical Leave Act ("FMLA"), the plaintiff alleges that the Jail did not notify him of his rights under the FMLA and that his lack of notice bars the Jail from constructively terminating him. In addition, the plaintiff alleges the Jail's refusal to return him to his former position "prior to the FMLA qualified leave violated the FMLA." (Dk.62, ¶ 36).

D. *Timeliness of ADA Claims*

Before ever filing suit in federal court, an ADA plaintiff must, like a Title VII plaintiff, exhaust his administrative remedies by filing an EEOC charge. 42 U.S.C. § 12117(a); *see McKinley v. Yellow Freight System, Inc.,* 139 F.3d 911, 1998 WL 72783 (10th Cir.1998) (Table); *Martin v. State of Kansas,* 978 F.Supp. 992, 998 (D.Kan.1997). "According to 42 U.S.C. § 2000e–5(e), a charge of discrimination must be filed within 300 days after the alleged unlawful practice occurs."

*Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (footnote omitted); *see Mascheroni v. Board of Regents of Univ. of Cal.,* 28 F.3d 1554, 1557 n. 3 (10th Cir.1994) (The 180–day filing period "is extended to 300 days in 'deferral states,' where the EEOC defers to the enforcement efforts of a state agency empowered to undertake employment discrimination investigations."). This requirement gives the EEOC "the first opportunity to investigate the alleged discriminatory practices and permits it to perform its role in obtaining voluntary compliance and promote conciliatory efforts." *Spillman v. Carter,* 918 F.Supp. 336, 341 (D.Kan.1996) (citation omitted). This exhaustion requirement is a prerequisite to suit that functions like a statutes of limitations rather than as a jurisdictional requirement. *Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1228 (10th Cir.1997).

In its prior order deciding the defendant's motion to dismiss, the court held:

> If the plaintiff proves that the E.E.O.C. did receive his August 1995 letters, then he has timely filed his charges as to all unlawful employment practices alleged to have occurred in November 1994. In its motion, the defendant does not contend that any of the alleged discriminatory events occurred more than 300 days before August 1, 1995.

(Dk.70, p. 7). The court will not revisit the defendant's arguments against extending the 300–day period back from August 1, 1995. There is a genuine issue of material fact as to when and whether the EEOC received the plaintiff's letters of August of 1995. For purposes of this motion, the court will assume the EEOC received the letter on August 1, 1995, and that the verified charge letter in March of 1996 relates back to amend the deficiencies with the August letters. Thus, the court will consider the 300–day period to reach back only until the first part of October, 1994. The plaintiff's constructive discharge on November 15, 1995, plainly falls within this period, but his failure to accommodate claim requires more discussion.

In opposing summary judgment on his failure to accommodate claim as untimely, the plaintiff's entire argument is as follows:

> In this case, plaintiff contends the discriminatory conduct occurred on or about April, 1994 and *continued* through the date of his constructive termination. Due to the defendant's refusal to accommodate and place the plaintiff in a smoke free position, plaintiff was forced to take an indefinite medical leave of absence on or about July 8, 1994. The defendant's wrongful conduct in refusing to accommodate the plaintiff continued throughout the term of plaintiff's medical leave of absence. The refusal to accommodate continued until his constructive discharge on or about November 15, 1994.

(Dk.90, p. 9). The defendant argues that the plaintiff has not alleged any refusal to accommodate after his extended absence beginning July 8, 1994, and has not shown a continuing relationship between the alleged refusal to accommodate him and his constructive discharge in November of 1994.

Though 42 U.S.C. § 2000e–5(e) bars reference to events occurring more than 300 days before the filing of the plaintiff's charge, the continuing violation doctrine permits the inclusion of such incidents if they are sufficiently related and constitute a continuing pattern of discrimination. *Hunt v. Bennett,* 17 F.3d 1263, 1266 (10th Cir.), *cert. denied,* 513 U.S. 832, 115 S.Ct. 107, 130 L.Ed.2d 55 (1994); *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d at 1414–15. To invoke this doctrine, the plaintiff must show either (1) a series of related acts against him, at least one of which falls within the limitations period; or (2) a company-wide policy of discrimination both before and during the limitations period. *Purrington v. University of Utah,* 996 F.2d 1025, 1028 (10th Cir.1993). In determining whether a continuing violation

existed, several nonexclusive factors are considered, including: "(i) subject matter—whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence—whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences would continue even in the absence of a continuing intent to discriminate." *Martin,* 3 F.3d at 1415.

Resting on the equitable premise that a limitations period should not commence until the injured party is aware of a violation, the continuing violation doctrine generally will not overcome an untimely filing when the "events should have alerted a reasonable person to . . . assert his or her rights at the time of the violation." *Martin,* 3 F.3d at 1415. " 'The proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences* of the acts became most painful.' " *Mascheroni,* 28 F.3d at 1561 (quoting *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). "It is not sufficient merely that acts outside the required time limit had a continuing effect within the statutory time allowed for suit." *Martin,* 3 F.3d at 1415.

The evidentiary burden remains on the plaintiff to come forth with admissible evidence that the defendant's refusal to accommodate is part of a continuing violation. *See Huels v. Exxon Coal USA, Inc.,* 121 F.3d 1047, 1049–50 (7th Cir.1997). The plaintiff has failed to carry his burden. On the claim of refusal to accommodate with a transfer to a non-smoking area, the only admissible evidence cited in favor of the plaintiff is his deposition testimony at pages 45 through 48 and pages 75 through 77. This testimony is confusing, contradictory, and conclusory. The testimony does not detail when the plaintiff made the transfer requests, to whom the requests were made, or when the transfer requests were denied. The

testimony does not prove that any of the plaintiff's transfer requests occurred between April and the date of his constructive discharge in November of 1994,[3] that any of the transfer requests was couched as an effort to accommodate a disability, or that the denial of his transfer requests occurred with such frequency as to be considered recurring as opposed to singular or isolated. In short, the plaintiff offers no evidence linking the denial of his transfer requests with his constructive discharge and stands on his bare allegation that both are based on his perceived disability. *See Stewart v. County of Brown,* 86 F.3d 107, 111 (7th Cir.1996) ("The law, however, does not permit such a tenuous connection between an earlier allegation of discrimination and a later one, for good reason."). Even assuming the plaintiff offered specific evidence of the denial of a transfer as part of an accommodation request and of its connection to his constructive discharge, the court still would be inclined to view it as a discrete discriminatory act whose effects are apparent without further discrimination. *See Sumner v. Michelin North America, Inc.,* 966 F.Supp. 1567, 1583–84 (M.D.Ala.1997). The plaintiff's evidence of these alleged transfer requests cannot sustain a finding that they amount to a series of related acts of purposeful discrimination required to be admissible under the continuing violation doctrine. *Purrington,* 996 F.2d at 1028. Accordingly, consideration of these incidents occurring beyond the 300–day limitations period is time-barred.

### E. *Timeliness of FMLA Claim*

An action under the FMLA must be brought "not later than 2 years after the date of the last event constituting the alleged violation" or within "3 years" of an alleged "willful violation." 29 U.S.C. § 2617(c)(1), (2). The plaintiff did not attempt to assert any claim under the FMLA until May of 1997 when he filed his

---

**3.** From July 8, 1994, to November 1, 1994, the plaintiff's physician had not released him

for work at the Jail under any recommended accommodation.

motion for leave to file a second-amended complaint. The defendant argues the plaintiff's FMLA claim is untimely unless it relates back to the original complaint filed in June of 1996. The plaintiff argues his FMLA claim is timely as it relates back to his original complaint pursuant to Fed.R.Civ.P. 15(c).

Rule 15(c)(2) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." The premise underlying Rule 15(c) is "that once notified of pending litigation over particular conduct or a certain transaction or occurrence, the defendant has been given all the notice required for purposes of the statute of limitations." *Marsh v. Coleman Co., Inc.,* 774 F.Supp. 608, 612 (D.Kan.1991) (citing *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 149 n. 3, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984)). "The linchpin to Rule 15(c) is notice before the limitations period expires." *Id.* (citing *Schiavone v. Fortune,* 477 U.S. 21, 31, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986)). Put another way, the " '[d]efendant is not deprived of the protection of the statute of limitations if the original complaint fairly discloses the general fact situation out of which the new claims arise.' " *Spillman v. Carter,* 918 F.Supp. at 340 (quoting *Masters v. Daniel Intern. Corp.,* 1991 WL 107410, at *10 (D.Kan. May 3, 1991)).

The courts "somewhat liberally" apply the relation back provisions of Rule 15. *Powers v. Graff,* 148 F.3d 1223, 1998 WL 436362, at *2 (11th Cir. Aug.3, 1998). As a general rule, amendments will relate back if they amplify the facts previously alleged, correct a technical defect in the prior complaint, assert a new legal theory of relief, or add another claim arising out of the same facts. *See F.D.I.C. v.*

*Conner,* 20 F.3d 1376, 1385–86 (5th Cir. 1994); *Marsh,* 774 F.Supp. at 612. "[F]or relation back to apply, there is no additional requirement that the claim be based on an identical theory of recovery." *Bularz v. Prudential Ins. Co. of America,* 93 F.3d 372, 379 (7th Cir.1996) (citations omitted). On the other hand, amendments generally will not relate back if they interject entirely different facts, conduct, transactions or occurrences. *F.D.I.C. v. Conner,* 20 F.3d at 1385–86. It is a matter committed to the district court's sound discretion to decide whether a new claim arises out of the same transaction or occurrence. *Wilson v. Fairchild Republic Co., Inc.,* 143 F.3d 733, 738 (2nd Cir.1998).

The court finds that the plaintiff's FMLA claim arises out of the same conduct, transaction, and occurrence as alleged in the plaintiff's original complaint. The original complaint put the defendant on notice that at issue were all of its reasons and bases for not transferring the plaintiff to a smoke-free unit, for its handling of the plaintiff's extended sick leave, and for allegedly refusing to let him return to work when the jail became smoke free. Specifically, the defendant knew that the plaintiff would be challenging the validity and legality of all these actions and of any business reasons the defendant would give for the actions. The addition of the FMLA claim here is a simple example of a plaintiff properly adding another theory of recovery to what are essentially the same factual allegations.[4] Thus, her claim is not barred by the two-year statute of limitations.

### F. ADA Claim

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee com-

---

4. The same can be said in justification of the plaintiff's later addition of her workers' compensation retaliatory discharge claim.

pensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined as "as individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To state a prima facie case of disability discrimination, the plaintiff must demonstrate: " '(1) that he is "disabled" within the meaning of the ADA; (2) that he is qualified—with or without reasonable accommodation; and (3) that he was discriminated against because of his disability.' " *Aldrich v. Boeing Co.*, 146 F.3d 1265, 1269 (10th Cir.1998) (quoting *Siemon v. AT & T Corp.*, 117 F.3d 1173, 1175 (10th Cir.1997)).

■ The ADA defines a "disability" in relevant part as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; ... or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). "The statutory requirement that disability determinations be made 'with respect to the individual,' contemplates an individualized, and case-by-case determination of whether a given impairment substantially limits a major life activity of the individual." *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 897 (10th Cir.1997) (citations omitted), *petition for cert. filed*, —— U.S. ——, 119 S.Ct. 790, 142 L.Ed.2d 653 (1999) (No. 97–1943). In applying this definition, one must know the meaning of three other important terms, "physical or mental impairment," "substantially limits," and "major life activities."

■ Though it does not define "physical or mental impairment, the ADA requires that the impairment "substantially limit" a major life activity. *Sutton*, 130 F.3d at 898. Thus, it "must be significant, and not merely trivial." *Id.* (citation omitted). The regulations implementing the ADA define physical impairment as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss af-

fecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin and endocrine." 29 C.F.R. § 1630.2(h). "If the underlying disorder or condition makes worse or diminishes in a material respect any of the enumerated body systems of the individual, then it should be considered an 'impairment.' " *Sutton*, 130 F.3d at 899.

■ Nor does the ADA define the term "major life activities" as used in 42 U.S.C. § 12102(2)(A). However, "[t]he ADA regulations adopt the definition of 'major life activities' found in the Rehabilitation Act regulations, 34 C.F.R. § 104." *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 942 (10th Cir.1994), *cert. denied*, 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995). "The term means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* (quoting 29 C.F.R. § 1630.2(i)). The ADA regulations also specify that for a physical or mental impairment to be "substantially limiting," the individual must be:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The determination whether an individual is substantially limited in a major life activity involves consideration of the following three factors: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent long term impact, or the expected permanent or long term impact of

or resulting from the impairment." *Sutton*, 130 F.3d at 900 (citations omitted).

The statutory definition of "disability" includes "being regarded as having" a physical or mental impairment that substantially limits one or more of the major life activities. 42 U.S.C. § 12102(2)(c). The Tenth Circuit recently summarized the relevant law governing such a disability claim:

> The regulations provide three ways an individual is 'regarded as' being disabled: (1) the individual: "[h]as a physical or mental impairment that does not substantially limit major life activities but is treated ... as constituting such limitation;" (2) the individual "[h]as a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment;" or (3) the individual "[h]as none of the impairments defined in [29 C.F.R. § 1630.2(h)(1) and (2) ] but is treated ... as having a substantially limiting impairment." 29 C.F.R. § 1630.2(*l*)(1)–(3). *See MacDonald [v. Delta Air Lines, Inc.*], 94 F.3d [1437] at 1444 [ (10th Cir.1996).] (quoting and adopting 29 C.F.R. § 1630.2(*l*)). "Thus, '[a] person is "regarded as having" an impairment that substantially limits the person's major life activities when other people treat that person as having a substantially limiting impairment,' regardless of whether the individual actually has an impairment." *MacDonald*, 94 F.3d at 1444 (quoting *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995) (citation omitted). The focus is on the impairment's or the perceived impairment's effect upon the attitudes of others. *Id. See Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 913 (11th Cir.1996).

> . . . .

Therefore, in order to establish a disability under the "regarded as" prong of the ADA with respect to the major life activity of working, an individual must show that the employer regarded him or her as being substantially limited in performing either a class of jobs or a broad range of jobs in various classes.

*Sutton*, 130 F.3d at 904–04.

On his failure to accommodate claim,[5] the plaintiff alleges his "impairment, which was caused by the smoke filled environment, substantially limited his major life activities of working and breathing." (Dk.90, p. 13). This is the entirety of the plaintiff's proof and argument of a disability for this claim.

 "[T]o demonstrate that an impairment 'substantially limits' the major life activity of working, ... [the plaintiff] must show a 'significant restriction in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.' " *Siemon v. AT & T Corp.*, 117 F.3d at 1176. " 'The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.' " *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(i)). "A 'class of jobs' is defined as '[t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment.' " *Sutton*, 130 F.3d at 904 (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(B)). "A 'broad range of jobs in various classes' is defined as '[t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment.' " *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(C)).

---

5. Though the court already has held that the plaintiff did not timely exhaust his administrative remedies on this ADA claim, the court will address briefly the merits of this claim.

■ The plaintiff comes forth with no evidence from which a jury could find that his breathing difficulties around smoke prevented or significantly restricted him from performing a class of jobs or a broad range of jobs in various classes. The plaintiff does not attempt to prove that his impairment barred him from doing anything more than his particular job before the Jail went smoke free. Without this additional proof, the plaintiff cannot defeat summary judgment on this claim of disability. *See Gupton v. Commonwealth of Virginia,* 14 F.3d 203, 205 (4th Cir.), *cert. denied,* 513 U.S. 810, 115 S.Ct. 59, 130 L.Ed.2d 17 (1994); *Rhoads v. F.D.I.C.,* 956 F.Supp. 1239, 1246 (D.Md.1997).

The plaintiff also has failed to demonstrate that he is "significantly restricted as to the condition, manner, or duration of . . . [his ability to breathe] as compared to the average person in the general population, taking into consideration the three listed factors" in 29 C.F.R. § 1630.2(j)(1)(i). *Sutton,* 130 F.3d at 901. The record is utterly devoid of evidence from which to evaluate the plaintiff's breathing problems as of 1994. The plaintiff does not direct the court's attention to any evidence on the nature and severity of his problems, the frequency with which these problems allegedly impaired his breathing, or the permanent or long term impact from his impairment.[6] The court

has no evidentiary basis for comparing Kidwell's ability to breathe with that of the average person. When he helped move a friend in late October of 1994, the plaintiff learned that his physical conditioning was less than he had believed. While this is some evidence of a limitation, the court is without other evidence to consider the nature, duration or cause of the limitation. There also is evidence that belies his claim of a breathing disability. The plaintiff occasionally smoked cigarettes during the period when he allegedly was disabled as a result of his exposure to smoke at work. The plaintiff offers no evidence that his breathing problems otherwise curtailed his daily activities. In fact, the plaintiff found other employment after he left the Jail.

In short, the plaintiff comes forth with no medical proof to substantiate that his alleged condition significantly restricted his ability to work and/or breathe. In this circumstance, a plaintiff cannot defeat summary judgment by mere conjecture or by raising some metaphysical doubt. *Heilweil v. Mount Sinai Hospital,* 32 F.3d at 723. On the record as it exists, a jury could not find that the plaintiff suffered an impairment that substantially limited his ability to breathe or work.

Even though the plaintiff has not carried that burden, he may still prove he is "disabled" under the ADA if he can show that

**6.** The defendant attached the deposition of Dr. Rhoads that was taken in the workers' compensation proceedings. The court studied those portions cited by the defendant. The court is not obligated to peruse the remaining portions of Rhoads' deposition unless the parties cite them, which they have not done. Even so, the court made a cursory reading of the deposition and found no admissible medical opinion that Kidwell's condition substantially limited his general ability to breathe. Rhoads did opine that Kidwell's symptoms were aggravated by the exposure to the second-hand smoke at the Jail and that his symptoms improved to the point of being minimal after he left the Jail's employment. This testimony is some evidence that the plaintiff may be restricted as to the condition and manner in which he can breathe. This restriction, however, would be not be substantial in that after he left the Jail's employment,

Kidwell worked elsewhere and apparently had few, if any, symptoms that required medical treatment or that affected his ability to breathe. *See Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723 (2nd Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995); *see also Rhoads v. F.D.I.C.,* 956 F.Supp. 1239, 1247 (D.Md.1997) ("[W]here the additional major life activities which the plaintiff claims are substantially limited, such as the ability to 'breathe,' are all triggered solely by her workplace environment, the traditional approach found in the ADA for determining whether such impairments are sufficiently severe to be classified as a disability appears inadequate. In these limited circumstances, the proper inquiry should remain focused on the extent to which an ADA claimant is capable of successfully pursuing a given vocation with or without reasonable accommodation." (footnote and citation omitted)).

the defendant regarded Kidwell as having such an impairment. The plaintiff argues that the Jail's Administrator, Tom Merkel, had been told that the plaintiff's condition was permanent and possibly fatal. Merkel replaced Kidwell in August of 1994 and did not place him on the work schedule after his release. The plaintiff argues a jury could find from this evidence that the defendant regarded him as suffering from an impairment that substantially limited his ability to breathe or work.

It is uncontroverted that Merkel knew that Kidwell's health problems had been ongoing for several years and had appeared serious at times. " '[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action.' " *Reeves v. Johnson Controls World Services, Inc.,* 140 F.3d 144, 153 (2nd Cir.1998). The plaintiff offers no evidence from which a jury could reasonably find that the defendants erroneously perceived Kidwell as substantially limited in his ability to do his job. The Jail did not replace Kidwell in August but rather hired for the vacancy created by Kidwell's extended absence. Because of the frequent turnover in the correction specialist position, vacancies occurred regularly. Consequently, one could not reasonably infer an erroneous perception from the defendant hiring for a vacancy. Such employment action indicates little more than the defendant's concern over keeping the Jail fully staffed, and it does not rule out the defendant's belief that a position would likely be available whenever the plaintiff returned. In fact, it is uncontroverted that the written minutes of the Shawnee County Corrections Department Lieutenant's meeting of October 14, 1994, reflect that Kidwell would be returning to work on November 1, 1994. The failure to place Kidwell on any work schedule for November is consistent with the uncontroverted evidence that Kidwell's attorney later called and said Kidwell would not be returning to work on November 1, 1994,

that there were ongoing concerns with whether Risk Management had received and approved the plaintiff's work release, and that Kidwell subsequently submitted his resignation on November 15, 1994. If anything, the record indicates that Jail officials thought Kidwell was capable of doing his job after the Jail was smoke free and that it was Kidwell who perceived himself as impaired and unable to work. *See Gaddy by and through Gaddy v. Four B Corp.,* 953 F.Supp. 331, 338 (D.Kan.1997) (The ADA does not recognize a definition of disability based on the plaintiff's unilateral perception of his condition as disabling when it is not actually disabling within the meaning of the ADA.)

The defendant is entitled to summary judgment on the plaintiff's ADA claims.

### G. *Retaliatory Discharge*

The defendant seeks summary judgment on this claim arguing that the plaintiff has no proof of a causal connection between his termination or constructive discharge and his exercise of workers' compensation rights. The plaintiff's response consists principally of the following:

> Mr. Kidwell's retaliatory discharge claim is based upon a statement attributed to Mr. Merkel, the Jail Administrator, that Mr. Kidwell could not return to the Jail unless he dropped his workers compensation claim. Mr. Kidwell has established a prima facie case by showing he filed a workers compensation claim, the employer had knowledge of his injury, he was constructively terminated on November 14, 1994, and direct evidence regarding the statement of Mr. Merkel creates the causal connection between Mr. Kidwell's exercise of his workers compensation rights and his constructive discharge.

(Dk.90, p. 15).

The burden rests with the plaintiff to prove that the defendant constructively discharged him in retaliation for filing a claim under the Kansas Workers' Compensation Act. *Ortega v. IBP,* 255

Kan. 513, 528, 874 P.2d 1188 (1994). The plaintiff can recover only upon proving that the discharge was "based on," "because" of, "motivated by" or "due to" the employer's intent to retaliate. *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 146–148, 815 P.2d 72 (1991). The plaintiff need not prove that retaliation was the employer's sole motive or reason for the termination. *Brown*, 249 Kan. at 147, 815 P.2d 72. The plaintiff must establish his claim "by a preponderance of the evidence, but the evidence must be clear and convincing in nature." *Ortega v. IBP*, 255 Kan. 513, 528, 874 P.2d 1188 (1994). Evidence is clear if "it is certain, unambiguous, and plain to the understanding." *Id.* "It is convincing if it is reasonable and persuasive enough to cause the trier of fact to believe it." *Id.* (citing *Chandler v. Central Oil Corp.*, 253 Kan. 50, 58, 853 P.2d 649 (1993)).[7]

■ In analyzing state retaliatory discharge claims, the federal district courts in Kansas consistently have applied the United States Supreme Court's burden shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Chaparro v. IBP, Inc.*, 104 F.3d 367, 1996 WL 733771, at *5 (10th Cir. Dec. 24, 1996) (Table), *cert. denied*, —— U.S. ——, 118 S.Ct. 53, 139 L.Ed.2d 18 (1997); *see, e.g., Barnard v. ADM Milling Co., Inc.*, 987 F.Supp. 1337, 1344 (D.Kan.1997); *Deghand v. Wal–Mart Stores, Inc.*, 926 F.Supp. 1002, 1017 (D.Kan.1996); *cf. Ortega v. IBP, Inc.*, 255 Kan. at 518, 874 P.2d 1188 (After noting that the plaintiff must prove a causal nexus between the employee's protected activity and the employer's decision to terminate, the Kansas Supreme Court referred to the burden-shifting scheme from *McDonnell–Douglas* as the approach it utilizes in discrimination and free speech employment cases). Un-

der the burden shifting approach, a prima facie case raises " 'a rebuttable presumption' " of a retaliatory intent. *See Ingels v. Thiokol Corp.*, 42 F.3d 616, 621 (10th Cir. 1994) (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 771 (10th Cir. 1988)). The burden of production now shifts to the defendant to rebut the presumption by offering a legitimate, nonretaliatory motive for the discharge. If rebutted, the presumption drops out of the case, and the plaintiff must carry the full burden of persuasion of proving by a preponderance of the evidence, which is clear and convincing in nature, that the defendant acted with retaliatory intent. *Ingels*, 42 F.3d at 621.

■ To establish a prima facie case of retaliatory discharge under Kansas law, a plaintiff must produce evidence demonstrating: (1) that the plaintiff filed a claim for workers' compensation benefits or sustained an injury for which he might assert a future claim for such benefits; (2) that the employer had knowledge of the plaintiff's compensation claim or the fact that the plaintiff had sustained a work-related injury for which he might file a future claim for benefits; (3) that the employer terminated the plaintiff's employment; and (4) that a causal connection existed between the protected activity or injury, and the termination. *Robinson v. Wilson Concrete Company*, 913 F.Supp. 1476, 1483 (D.Kan.1996); *Huffman v. Ace Elec. Co., Inc.*, 883 F.Supp. 1469, 1475 (D.Kan.1995); *Rosas v. IBP, Inc.*, 869 F.Supp. 912, 916 (D.Kan.1994).

■ The central issue here is whether the plaintiff has met the fourth element of his prima facie case. Namely, does the summary judgment record contain "clear and convincing" evidence from which a reasonable juror could find "it more proba-

---

7. For the evidence to be clear and convincing, "the witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue." *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 78, 596 P.2d 816 (1979) (citations omitted).

ble than not" that because the plaintiff filed a workers' compensation claim the defendant took certain actions which led to the plaintiff's resignation. In opposing summary judgment, the plaintiff argues his retaliatory discharge claim is "based upon" Merkel's statement that he "could not return to the Jail unless he dropped his workers compensation claim." The record does not contain admissible evidence of this very comment ever being made. Instead, the plaintiff's attorney at the time, Allen Ternent, understood Merkel to say that "he didn't think he [Kidwell] could come back because a claim had been filed" but that Merkel would check with "the folks in risk management." (Dk. 90, Ternent Dep. p. 36). The plaintiff testified that Merkel had told him that Kidwell "had to get whatever it was with risk management straightened out." (Dk. 90, Kidwell Dep. at 80). Neither Ternent nor the plaintiff testified that Merkel said Kidwell could not return unless he dropped his workers' compensation claim.

The uncontroverted evidence is that Risk Management requires a work release from an injured employee and determines from the release whether the employee has recovered enough for full duty or less. The gist of what the plaintiff and Ternent recall Merkel saying is entirely consistent with this uncontroverted evidence on Risk Management's supervisory role in reviewing and approving an injured employee's release and return to work. In short, the testimony about Merkel's prior comments is not clear and convincing evidence that Merkel was acting on a retaliatory intent when he made those comments or that Merkel even intended by his comments to discourage the plaintiff from returning to work. Indeed, the defendant was apparently planning for the plaintiff's return until Ternent called in late October to say that the plaintiff would not be returning on November 1, 1994. Finally, the plaintiff has not come forth with clear and convincing evidence that his resignation on No-

vember 15th was due to Merkel's earlier comments.[8] The defendant is entitled to summary judgment on this claim.

## H. *FMLA*

The defendant argues the plaintiff cannot prevail on this claim, as he voluntarily resigned after informing the Jail that he was physically unable to do the job. The defendant further argues that the plaintiff did not ask for a leave of absence when informed that one was available. In response, the plaintiff maintains the defendant failed to inform him of the right to return to his former position at the Jail and failed to schedule him.

"Congress enacted the FMLA in 1993 in response to demographic changes in the workforce that had negatively impacted the family's ability to care for children and ill family members." *Gudenkauf v. Stauffer Communications, Inc.*, 922 F.Supp. 465, 474 (D.Kan.1996) (citing 29 U.S.C. § 2601(a)). Under the FMLA, an eligible employee is entitled to twelve workweeks of leave over any period of twelve months due to, among other things, a serious health condition which leaves the employee unable to perform the requirements of his job. *Gudenkauf*, 922 F.Supp. at 474 (citing 29 U.S.C. § 2612(a)). Following a qualified leave period, an employee is entitled to reinstatement to his former position or an equivalent one with the same benefits and terms. 29 U.S.C. § 2614(a). The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a). *See Satterfield v. Wal–Mart Stores, Inc.*, 135 F.3d 973, 975 (5th Cir.1998), *petition for cert. denied*, —— U.S. ——, 119 S.Ct. 72, 142 L.Ed.2d 57 (1998) (No. 97–2056); *Gudenkauf*, 922 F.Supp. at 474.

---

**8.** As reflected in the court's statement of uncontroverted facts, the plaintiff's own testimony on his reasons for resigning is so con-

tradictory, inconsistent and confusing as to disqualify it from being clear and convincing.

■ The FMLA requires employers to provide employees with information about their rights and obligations under the FMLA. Employers are required "to post and keep posted ..., in conspicuous places where employees are employed, ..., a notice explaining the Act's provisions." 29 C.F.R. § 825.300(a). "[A]n employer that fails to post the required notice cannot take any adverse action against an employee, including denying FMLA leave, for failing to furnish the employer with advance notice of a need to take FMLA leave." 29 C.F.R. § 825.300(b). Section "825.300(b) by its own terms, applies only in situations where the employee is required to provide '*advance*' notice of a need for FMLA leave." *Satterfield v. Wal–Mart Stores, Inc.*, 135 F.3d at 983; *see Gilbert v. Star Building Systems*, 129 F.3d 130, 1997 WL 687732, at *1 (10th Cir. Oct. 30, 1997) (Table) (A private litigant "has no basis to seek relief for employer's violation of FMLA's requirements for posting notice." (citation omitted)).

■ The summary judgment record does not contain evidence from which a reasonable jury could find that the defendant discharged the plaintiff for not giving advance notice of the need for FMLA leave. The uncontroverted record is that after the plaintiff used all of his accrued benefits, the defendant sent the plaintiff a letter that notified him of his right to request a leave of absence. It is immaterial here that this notice did not mention the FMLA.[9] What is important is that the plaintiff received actual notice of a right to request a leave of absence, that he chose not to exercise that right, and that he did not suffer any consequences from that choice. The plaintiff comes forth with no evidence showing that the defendant denied a request for leave of absence or that the defendant barred him from returning to work or otherwise discharged him because he had not provided notice of the need for FMLA leave.

Nor does the summary judgment record contain evidence from which a reasonable jury could find that the defendant denied, or interfered with or restrained the plaintiff from exercising or attempting to exercise any right provided under the FMLA. Though receiving actual notice of his right to a leave of absence, the plaintiff did not request one. There is no evidence that the defendant denied the plaintiff any right to return to work protected under the FMLA. When the plaintiff indicated a willingness to return to work, the defendant fully anticipated his return as reflected in the minutes from the October lieutenant's meeting. Of course, the plaintiff did not return to work, as he had his attorney call to say that he was still physically unable to work. The absence of the plaintiff's name on a work schedule has been adequately explained by the apparent confusion over whether the defendant had submitted his physician's release to the defendant and to Risk Management. Even if the plaintiff properly submitted his release, the plaintiff has not shown that between his attorney's telephone call in October and his written resignation in November he told the defendant that he was able to work and wanted to return to his former position. The plaintiff's mere allegations and speculation that the defendant would have refused his return to work are not enough to prevent summary judgment here.

Having decided to grant the defendant's motion for summary judgment on all the plaintiff's claims, the court considers the defendant's motion to review the magistrate judge's order (Dk.95) to be moot and denies it for that reason.

IT IS THEREFORE ORDERED that the defendant's motion to reconsider (Dk.72) is denied;

IT IS FURTHER ORDERED that the defendant's motion for summary judgment (Dk.75) is granted;

9. In fact, the Union contract covering the plaintiff gave him the right to a longer leave

of absence than that afforded him under the FMLA.

IT IS FURTHER ORDERED that the defendant's motion to review the magistrate judge's order (Dk.95) is denied as moot.